UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN VLASICH, | 1:13-cv-00326-LJO-GSA-PC |
| Plaintiff, | ORDER DISMISSING FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM, WITH LEAVE TO AMEND (Doc. 13.) |
| vs. | |
| DR. NAREDDY, et al., | THIRTY DAY DEADLINE TO FILE SECOND AMENDED COMPLAINT AS INSTRUCTED BY THIS ORDER |
| Defendants. | |

## I.    BACKGROUND

Steven Vlasich ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis with this civil rights action pursuant to 42 U.S.C. § 1983.  On March 7, 2013, Plaintiff filed the Complaint commencing this action.  (Doc. 1.)  The court screened the Complaint pursuant to 28 U.S.C. § 1915A and issued an order on October 21, 2013, dismissing the Complaint for violation of Rule 8(a) of the Federal Rules of Civil Procedure, with leave to amend.  (Doc. 8.)  On December 26, 2013, Plaintiff filed the First Amended Complaint, which is now before the court for screening.  (Doc. 13.)

## II.    SCREENING REQUIREMENT

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are

1

legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.   28 U.S.C. § 1915A(b)(1),(2).   "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)).  While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted).  Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal 556 U.S. at 678.  While factual allegations are accepted as true, legal conclusions are not.  Id.  The mere possibility of misconduct falls short of meeting this plausibility standard.  Id. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

### III.    SUMMARY OF FIRST AMENDED COMPLAINT

Plaintiff is presently incarcerated at the California State Prison-Sacramento in Represa, California.  The events at issue in the First Amended Complaint allegedly occurred at Corcoran State Prison (CSP) in Corcoran, California, when Plaintiff was incarcerated there.  Plaintiff names as defendants the Kern Radiology Medical Group, Dr. C. Nareddy, Dr. C. McCabe, Dr. J. Wang, Dr. E. Clark, Dr. O. Beregovskaya, Dr. L. Karan, Dr. G. Williams, Dr. R. Barnett, Dr. J. Child, Nurse Practitioner (NP) C. Sisodia, Lieutenant (Lt.) Ruiz, Correctional Officer (C/O) Price, two Jane Doe Defendants (2nd Watch E.R. Nurses), and Appeals Examiners N. Warren, J. Walker, Q. Obrian, and J. Tercero (collectively, "Defendants").  Plaintiff's factual allegations follow.

///

### *Plaintiff's Medical Treatment*

In 2005, Plaintiff was given an MRI exam which found he had degenerative facet joint disease bilaterally, causing left neural foraminal stenosis with slight flattening of the L5 nerve root.  Over the next seven years, Plaintiff was treated with Methodone and nerve blocking injections.  In 2011, Dr. Barnett ordered doctors at CSP to decrease the use of narcotic pain relievers.

Plaintiff had a walker he used in his cell.  In February 2011, Lt. Ruiz ordered C/O Price to take the walker and only allow Plaintiff to use it outside of his cell.  Due to this, Plaintiff suffered more pain and fell numerous times in the cell.  Plaintiff filed an inmate appeal which was denied in May 2011 at the first level by Dr. O. Beregovskaya who did not examine Plaintiff but wrote that Plaintiff had a "normal exam."  (Amd Compl (ACP) at 4 ¶IV.)  Dr. Beregovskaya had examined Plaintiff in April 2011, and the exam was abnormal.  On July 8, 2011, Dr. Beregovskaya reduced Plaintiff's Methadone from 60 mgs. to 50 mgs., despite the fact that in April 2011 she had agreed that Plaintiff needed the 60 mgs.

On July 26, 2011, Plaintiff saw Dr. Nareddy who found that Plaintiff had tachycardia of 120-130, and Plaintiff was sent to the E.R.  Dr. Nareddy's report noted that Plaintiff had "no impinging nerve," whereas the 2005 MRI showed "left L5 nerve impingement." (ACP at 5:8-12.)  Dr. Nareddy lied about other things on his report.

Plaintiff repeatedly requested his Methodone to be increased to 80 mgs. per day.  On October 25, 2011, Dr. Nareddy saw Plaintiff for a Pain Committee review and again wrote false facts about Plaintiff's condition in his report, stating that Plaintiff was malingering.  On January 19, 2012, the Pain Committee, which included Drs. Karan and Wang, reviewed Plaintiff's medical file and made false reports about his condition.  On the same page, they reported that "there is apparently no radiation of the pain" and "[h]is back went out in 2005 and has been painful ever since with pain radiating down the left side."  (ACP at 5-6.)  The report said nothing about the doctors and pain specialists Plaintiff had seen during the past seven years who determined that Plaintiff needed narcotic pain medication.  The Committee recommended that Plaintiff be weaned off Methodone and that his chronos for double mattress, wedge pillow,

walker, and waist chain be discontinued.   Plaintiff asked Dr. Nareddy the names of the members of the Pain Committee, but Dr. Nareddy refused to tell him.

When Plaintiff's Methodone was reduced from 50 to 40 mgs., he felt horrible, suffered increased pain, could not sleep, and became bedridden.   Almost every day, Plaintiff sent medical slips asking for help, but Dr. Nareddy ignored him.   An appointment was scheduled for Plaintiff on February 13, 2012, but he was ignored.   Plaintiff had an episode of bladder incontinence.   On February 22, 2012, Plaintiff saw Dr. Nareddy, who found Plaintiff had tachycardia again with a pulse of 132.   Plaintiff could not walk because of pain and used a wheelchair.   Plaintiff was sent to the E.R. where Dr. Nguyen said that the tachycardia was most likely related to Plaintiff's pain issues and withdrawal from Methodone.   He prescribed Tylenol 3 and said he would increase the Methodone a little.   Dr. Nareddy spoke with Dr. Nguyen, and Plaintiff's Methodone was never increased.   On February 22, 2012 and February 29, 2012, Dr. Nareddy refused to see Plaintiff.   On February 29, Plaintiff fell, went to the E.R. and was prescribed Tylenol 3.

On March 1, 2012, Plaintiff saw PA Sisodia concerning the first level of an appeal. Plaintiff's pulse was 134 and his blood pressure was 139/91, but Plaintiff was not sent to the E.R.   PA Sisodia told Plaintiff that the Pain Committee had reported no impingement, and Plaintiff told her (Sisodia) this was false and offered to provide her with a copy of the 2005 MRI.   Plaintiff explained about his pain and told PA Sisodia he could not sleep, but she refused to do anything.   Plaintiff discovered that when Dr. Nareddy heard Plaintiff's name called, he came out of his office and yelled down the hall to PA Sisodia, telling her not to help Plaintiff in any way.   Plaintiff sent PA Sisodia a copy of his 2005 MRI as soon as he got back to his cell.

Plaintiff requested interviews and sent a letter to Drs. Wang and McCabe about Dr. Nareddy's misconduct and the false reports.   Plaintiff was told to submit an appeal.   Plaintiff sent numerous letters to CDCR Health Care headquarters, the Prison Law Office, and Drs. Wang, McCabe, Clark, and Nareddy about the misconduct and false reports.

Plaintiff developed high blood pressure, which he had never had before.   On March 12, 2012, Plaintiff was scheduled to see Dr. Clark, but Dr. Clark refused to see him.   On March 16,

2012, Plaintiff blacked out and hit his head on the sink and was taken to the E.R.  He left his building around noon and was placed in a holding cell in his wheelchair.  After about 20 minutes, Plaintiff complained to Jane Doe that he was in extreme pain and needed to be taken out of the holding cell, but she refused.  Plaintiff involuntarily vacated his bladder and complained to Jane Doe that he was sitting in his own urine in extreme pain, but she refused to take him out of the cell.  Plaintiff slid down out of the wheelchair to lay on the floor soaked with urine.  He complained again to Jane Doe, but she refused to take him out of the cell. Plaintiff lay in the cell until about 4-5pm, when he was finally taken to see Dr. Aye, who prescribed an injection of Torodol, Tylenol 3, Robaxin, and Prednisone and scheduled Plaintiff to see the yard doctor in a week.  Plaintiff filed a prison appeal, and the CDCR investigated and found that Jane Doe had violated CDCR policy.

On March 20, 2012, Plaintiff saw PA Sisodia who noted that Plaintiff wanted surgery and a new MRI.  She wrote a referral for the procedures, but both were denied by Dr. Beregovskaya.  PA Sisodia refused to prescribe anything for Plaintiff's pain.

On March 27, 2012, Plaintiff blacked out again and fell, went to the E.R. and saw Dr. Aye.  Dr. Aye refused to do anything except refer Plaintiff to the yard doctor within a week. On April 2, 2012, Plaintiff saw Dr. Clark who told him he had no authority to help him get a new MRI or treat his pain.

On April 10, 2012, Plaintiff was in so much pain he couldn't use his right leg.  This was the first time his right side had caused him pain.  He was sent to the E.R. where Dr. Gil sent him for a new MRI.  Plaintiff took a copy of his 2005 MRI and gave it to the medical staff, but when he was wheeled into the exam room he discovered he was scheduled for a CAT scan instead and complained that a CAT scan was not going to show his impingements.  Later, Plaintiff discovered that Dr. Gil had written MRI, crossed it out, and wrote CT scan with dye (contrast), but Plaintiff was not given contrast.  The results of the CT scan predictably did not mention the 2005 MRI and specifically stated "no foraminal stenosis, no bulges, no masses." (ACP at 9:18-19.)

///

From April 9-12, 2012, Plaintiff could not walk at all and had to defecate and urinate in cardboard cups.  Dr. Nareddy was informed that Plaintiff needed a bedpan, but he ignored Plaintiff.

When Dr. Nareddy met with Plaintiff on April 13, 2012 and told him the results of the CT scan, Plaintiff told him that the results contradicted the 2005 MRI, and an MRI is a superior test.  Plaintiff told Dr. Nareddy he needed a new MRI, but Dr. Nareddy said, "You know that is not going to happen." (ACP at 9-10.)  Then Dr. Nareddy told the Sergeant to make sure, when they wheeled Plaintiff back to his cell, to take away the wheelchair, walker, double mattress, wedge pillow, etc.  Plaintiff refused to get out of the wheelchair when he was returned to his building, which led to the Chief Medical Officer overriding Dr. Nareddy's order.  Dr. Nareddy's report said the 2005 MRI showed no impingement and only showed mild foraminal stenosis, which was untrue.  The report also said "likely self-motivated pain." (ACP at 10:10.) Dr. Nareddy did prescribe Metoprolol for Plaintiff's high blood pressure but ordered it given "DOT (Direct Observational Therapy) as the patient is noncompliant with the medications." (ACP at 10:12-13.)  Plaintiff was always compliant and no record states otherwise.

Plaintiff found out he was to see CDCR specialist Dr. Williams on May 9, 2012, so he wrote Dr. Williams a 10-page letter explaining all the falsifications and about the 2005 MRI. On May 9, 2012, Plaintiff saw Dr. Williams by video conference.  Dr. Williams watched Plaintiff try to do a number of exercises, then told Plaintiff he had no idea what was wrong with him and was not going to recommend anything.  He refused to look at Plaintiff's documents. Dr. Williams' report of the meeting was full of inaccuracies, completely ignoring the 2005 MRI and focusing on the CT scan result.  He wrote that Plaintiff showed willful misrepresentation of functional status and recommended Plaintiff see a psychiatrist.

On May 23, 2012, Plaintiff saw psychiatrist Dr. Ahlmeyer, who went through all of Plaintiff's documents showing falsifications.  Dr. Ahlmeyer was very sympathetic to Plaintiff.

The high blood pressure medication never worked, and Plaintiff was bedridden since February, with no yard or showers, and only left his cell for medical appointments, always in a wheelchair.

On June 27, 2012, Plaintiff saw PA Sisodia, reminded her about the 2005 MRI and the inaccurate CT scan results, and warned her not to use Dr. Williams' report. She refused to order an MRI, prescribe pain medication, or refer Plaintiff to a surgeon. In her report, she purposely used the CT scan results and Dr. Williams' report.

On July 10, 2012, Plaintiff saw Dr. Clark, who again refused to do anything.

On July 20, 2012, Plaintiff was called to the E.R. where Dr. Clark said someone in Sacramento ordered them to examine Plaintiff and if they found nerve root impingement, to give Plaintiff an MRI. The physical exam showed impingement, and on July 30, 2012, he was given an MRI which showed foraminal stenosis with impingement at L5, just like the 2005 MRI, in direct contradiction of the CT scan results. It also found that Plaintiff had a bulge with impingement at L5 and two nodular densities at L2 and L4. On August 13, 2012, Plaintiff was given another MRI, with contrast, which found that the tumor at L4 was a benign hemongioma, with follow up needed to diagnose the L2 tumor. On August 27, 2012, Plaintiff had another MRI which found another lesion at T9.

In August and September 2012, Plaintiff met three times with Dr. Karan, and her reports were filled with inaccuracies and things she knew to be false. She told Plaintiff she would not put him back on narcotic pain medication unless he had cancer.

On September 28, 2012, Plaintiff saw neurosurgeon Dr. T. Wiebe who reviewed the MRIs, told Plaintiff the tumor at L2 was pre-cancerous, and recommended surgery at L5 and L2.

On October 23, 2012, Plaintiff saw Dr. Nguyen who prescribed a low level of Methodone – 15 mgs. per day -- which reduced Plaintiff's pain. Dr. Nguyen said his superiors told him not to give Plaintiff a larger dose.

On November 27, 2012, Plaintiff had surgery. Afterward, he was told that the tumor at L2 was growing inside a nerve root, which had to be cut to extract the tumor. The surgeon also found that Plaintiff had right L5 nerve impingement, which the MRIs did not pick up. Plaintiff wrote to Dr. Child and the Kern Radiological Medical Group when he found out his 2005 MRI was not used as a reference, advising them to recheck the CT scan using the MRI as a guide.

They ignored him.  He wrote again telling them the CT scan results were having an adverse effect on his medical treatment, but he was ignored again.

### *Plaintiff's Grievances/Appeals*

Plaintiff appealed every medical issue.

On October 20, 2008, Dr. Wang partially granted appeal #09-08-16289, giving Plaintiff 80 mgs. of Methodone per day.  Dr. Walker decided this appeal at the third level of review.

On May 27, 2010, Dr. Walker denied appeal #09-09-13542, knowing that appeal #09-08-16289 had previously been granted, and allowed the Methodone to be decreased from 80 mgs. to 60 mgs., knowing Plaintiff was still in pain.

On January 4, 2011, N. Warren (appeals examiner) denied Plaintiff's appeal, stating that the Pain Committee evaluated Plaintiff in February 2010 and everything was within the guidelines, despite the fact that Warren knew Plaintiff was in pain and was denying Plaintiff the medication that would alleviate that pain.  Also, there were violations of the Pain Management guidelines.

On January 31, 2012, Q. Obrian (appeals examiner) denied appeal #09-11-10808 regarding the walker.  Plaintiff told Obrian he had a chrono for the walker, but Obrian denied the appeal knowing Plaintiff was in pain without the walker.

On February 23, 2012, the Prison Law Office got involved in Plaintiff's case.  On March 28, 2012, lawyer Alison Hardy sent a memo requesting a response from the prison regarding Plaintiff's medical needs.  On April 12, 2012, Dr. McCabe responded to the memo, claiming Plaintiff did not meet the criteria for stenosis, despite the fact that Plaintiff's 2005 MRI stated that Plaintiff does have stenosis.  He also claimed the MRI did not show nerve root compression, but acknowledged that other tests had found some nerve root flattening.  Dr. McCabe knew there were no other such tests, and that only the 2005 MRI showed flattening, which means the MRI showed left L5 nerve root impingement.

On June 4, 2012, Alison Hardy re-opened Plaintiff's case with a new memo noting all the Pain Committee's mistakes and falsifications in the January 19, 2012 report, including the fact that Plaintiff's 2005 MRI shows "slight flattening of the L-5 nerve root, which suggests

impingement." (ACP at 15:12-13.)  On June 19, 2012, Dr. Wang responded to the memo but failed to address the allegations against the Pain Committee and claimed that Plaintiff failed to meet the I.Q. criteria for an MRI, quoting the CT scan results and using Dr. Williams' report.

J. Tercero (appeals examiner) tried to block Plaintiff from completing the appeals process, for numerous appeals.  On June 17, 2012, Tercero rejected one of Plaintiff's appeals, claiming it duplicated a prior appeal about amending medical reports, but the appeal was about Dr. Williams falsifying the May 9, 2012 report.

All the defendants knew Plaintiff was in pain and were advised about the lies and inaccuracies, etc., and all of them kept lying and falsifying in an attempt to cover for each other, leaving Plaintiff bedridden and in extreme pain for about nine months.

Plaintiff requests monetary damages and preliminary injunctive relief.

## IV.   PLAINTIFF'S CLAIMS

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  "Section 1983 . . .  creates a cause of action for violations of the federal Constitution and laws."  Long v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations omitted).  "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress."  Id.

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law and (2) the defendant deprived him of rights secured by the Constitution or federal law.  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of

which complaint is made." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978). "The requisite causal connection can be established not only by some kind of direct, personal participation in the deprivation, but also by setting in motion a series of acts by others which the actors knows or reasonably should know would cause others to inflict the constitutional injury." <u>Id.</u> at 743-44.

A.   **Eighth Amendment Medical Claim**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S.Ct. 285 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." <u>Jett</u>, 439 F.3d at 1096 (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>WMX</u> <u>Techs., Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." <u>Id.</u> (citing <u>McGuckin</u>, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." <u>Id.</u> Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. <u>McGuckin</u> at 1060 (citing <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" <u>Id.</u> at 1057 (quoting <u>Farmer v. Brennan</u>, 511 U.S.

825, 837, 114 S.Ct. 1970 (1994)).  "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'"  Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).  "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment.  Id. at 1060.  "[E]ven gross negligence is insufficient to establish a constitutional violation."  Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)).

A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim."  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted).  To prevail, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

Plaintiff has demonstrated that he had serious medical needs, due to a medical condition that caused him extreme pain and other physical symptoms.  However, Plaintiff fails to allege facts showing that any of the defendants acted against him, or failed to act, while knowing of and deliberately disregarding a substantial risk of serious harm to Plaintiff.  At most, Plaintiff states a claim for negligence or medical malpractice, which are not actionable under § 1983.  Therefore, Plaintiff fails to state a claim for inadequate medical treatment under the Eighth Amendment.

### B.    Inmate Appeals Process

Plaintiff alleges that defendants improperly responded to his prison grievances and appeals.  Defendants' actions in responding to Plaintiff's inmate grievances or appeals, alone, cannot give rise to any claims for relief under section 1983 for violation of due process.  "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates."  Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (citing Azeez v. DeRobertis, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); see also Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no entitlement to a specific

grievance procedure); <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner); <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988). "Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the Fourteenth Amendment." <u>Azeez</u>, 568 F. Supp. at 10; <u>Spencer v. Moore</u>, 638 F. Supp. 315, 316 (E.D. Mo. 1986). Actions in reviewing a prisoner's administrative appeal, without more, are not actionable under section 1983. <u>Buckley</u>, 997 F.2d at 495. Thus, since he has neither a liberty interest, nor a substantive right in inmate appeals or complaints, Plaintiff fails to state a cognizable claim for the processing and/or reviewing of his misconduct complaints.

### C.    <u>Supplemental Jurisdiction</u>

To the extent that Plaintiff seeks supplemental jurisdiction over claims for negligence or medical malpractice, such jurisdiction is not appropriate at this stage of the proceedings. Violation of state tort law, state regulations, rules and policies of the CDCR, or other state law are not sufficient to state a claim for relief under § 1983. To state a claim under § 1983, there must be a deprivation of federal constitutional or statutory rights. <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693 (1976). Although the court may exercise supplemental jurisdiction over state law claims, Plaintiff must first have a cognizable claim for relief under federal law. <u>See</u> 28 U.S.C. § 1367. In this instance, the Court fails to find any cognizable federal claims in the Complaint. Therefore, Plaintiff's claims for violation of state law fail.

### D.    <u>Doe Defendants</u>

Plaintiff names two Jane Doe Defendants in this action. Plaintiff is advised that unidentified, or "Doe" defendants must be named or otherwise identified before service can go forward. "As a general rule, the use of 'John [or Jane] Doe' to identify a defendant is not favored." <u>Gillespie v. Civiletti</u>, 629 F.2d 637, 642 (9th Cir. 1980). John Doe or Jane Doe defendants cannot be served by the United States Marshal until Plaintiff has identified them as actual individuals and amended his complaint to substitute names for John Doe or Jane Doe. For service to be successful, the Marshal must be able to identify and locate defendants.

///

**V.    CONCLUSION AND ORDER**

The Court finds that Plaintiff's First Amended Complaint fails to state any cognizable claims upon which relief may be granted under § 1983.    Therefore, the First Amended Complaint shall be dismissed for failure to state a claim, with leave to amend.

Under Rule 15(a) of the Federal Rules of Civil Procedure, "leave to amend 'shall be freely given when justice so requires.'"    The Court will provide Plaintiff with time to file an amended complaint curing the deficiencies identified above.    Lopez v. Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000).    Plaintiff is granted leave to file a Second Amended Complaint within thirty days.

The amended complaint should be brief, but must state what each named defendant did that led to the deprivation of Plaintiff's constitutional or other federal rights.    Fed. R. Civ. P. 8(a); Iqbal, 556 U.S. at 678; Jones, 297 F.3d at 934.    There is no *respondeat superior* liability, and each defendant is only liable for his or her own misconduct.    Iqbal at 676.    Plaintiff must set forth "sufficient factual matter . . . to 'state a claim that is plausible on its face.'"    Id. at 678 (quoting Twombly, 550 U.S. at 555).    Plaintiff must also demonstrate that each defendant *personally* participated in the deprivation of his rights.    Jones, 297 F.3d at 934 (emphasis added).    Plaintiff should name each defendant and explain how each named defendant personally acted, or failed to act, resulting in a violation of Plaintiff's constitutional rights.

Plaintiff should note that although he has been given the opportunity to amend, it is not for the purpose of adding issues arising after he filed the Complaint on March 7, 2013.    In addition, Plaintiff should take care to include only those claims that have been exhausted prior to the initiation of this suit on March 7, 2013.    Plaintiff is cautioned that he may not change the nature of this suit by adding new, unrelated claims in his amended complaint. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) (no "buckshot" complaints).

Plaintiff is advised that an amended complaint supercedes the original complaint, Lacey v. Maricopa County, 693 F 3d. 896, 907 n.1 (9th Cir. 2012) (en banc), and it must be complete in itself without reference to the prior or superceded pleading, Local Rule 220.    Therefore, in an amended complaint, as in an original complaint, each claim and the involvement of each

defendant must be sufficiently alleged. The amended complaint should be clearly and boldly titled "Second Amended Complaint," refer to the appropriate case number, and be an original signed under penalty of perjury.

As Plaintiff was advised in the court's prior screening order, legal argument and evidence are not required at this stage of the litigation. A short and simple statement of his claim will speed the screening of his case, and will help the litigation proceed in a more efficient manner. In the interest of judicial efficiency and in the interest of timely addressing the many constitutional claims before it, the court therefore directs Plaintiff to file an amended complaint that complies with the following conditions:

1.    The amended complaint must be legibly written or typewritten on forms supplied by the court and signed by the plaintiff;

2.    The form must be completed in accordance with the instructions provided with the forms;

3.    The amended complaint must be a short, simple and concise statement of the claim;

4.    Additional pages beyond those allowed in the court's form may not exceed 25 pages without leave of court;

5.    The court approved form and any additional pages submitted must be written or typed on only one side of a page and the writing or typewriting must be double-spaced and no smaller in size than standard elite type.

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's First Amended Complaint, filed on December 26, 2013, is DISMISSED for failure to state a claim, with leave to amend;

2.    The Clerk's Office shall send Plaintiff a civil rights complaint form;

3.    Within **thirty (30) days** from the date of service of this order, Plaintiff shall file an amended complaint curing the deficiencies identified by the Court in this order and complying with the above conditions;

///

14

4.      Plaintiff may not add any new, unrelated claims to this action via his amended complaint and any attempt to do so will result in an order striking the amended complaint;

5.      Plaintiff shall caption the amended complaint "Second Amended Complaint" and refer to the case number 1:13-cv-00326-LJO-GSA-PC; and

6.      If Plaintiff fails to comply with this order, this action will be dismissed, with prejudice, for failure to state a claim upon which relief may be granted.

IT IS SO ORDERED.

Dated:   __**June 25, 2014**__              _____ **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE