UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN VLASICH,<br><br>            Plaintiff,<br><br>      v.<br><br>DR. C. NAREDDY and DR. O.<br>BEREGOVSKAYA,<br><br>            Defendants. | Case No. 1:13-cv-00326-LJO-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS,<br>RECOMMENDING THAT DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT<br>BE DENIED<br><br>(ECF NO. 41)<br><br>OBJECTIONS, IF ANY, DUE WITHIN<br>TWENTY-ONE DAYS |

## I.      BACKGROUND

Steven Vlasich ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action now proceeds on Plaintiff's Second Amended Complaint, against defendants Dr. C. Nareddy and Dr. O. Beregovskaya ("Defendants") on a claim for inadequate medical care in violation of the Eighth Amendment.  (ECF Nos. 17, 18, 21, & 22).

On March 7, 2017, Defendants filed a motion for summary judgment.[1]  (ECF No. 41). On April 24, 2017, Plaintiff filed his opposition to the motion.  (ECF No. 48).  On May 1, 2017, Defendants filed a reply to Plaintiff's opposition (ECF No. 50) and evidentiary objections to materials submitted by Plaintiff in opposition to Defendants' motion for summary judgment (ECF No. 51).

Defendants' motion for summary judgment is now before the court.  Local Rule 230(l). For the reasons that follow, the Court recommends that Defendants' motion be denied.

\\\

---

[1] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  <u>Woods v. Carey</u>, 684 F.3d 934, 939-41 (9th Cir. 2012); <u>Rand v. Rowland</u>, 154 F.3d 952, 960-61 (9th Cir. 1998).

## II.     PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT

Plaintiff is presently incarcerated at California State Prison-Sacramento in Represa, California, in the custody of the California Department of Corrections and Rehabilitation ("CDCR").   The events at issue in the Second Amended Complaint allegedly occurred at Corcoran State Prison ("CSP") in Corcoran, California, when Plaintiff was incarcerated there. This case is proceeding against defendants Dr. C. Nareddy and Dr. O. Beregovskaya. Defendants Dr. C. Nareddy and Dr. O. Beregovskaya were employed by the CDCR at CSP at the time of the events at issue.   Plaintiff's factual allegations follow.

Plaintiff had an MRI exam on May 6, 2005, which found he had degenerative facet joint disease bilaterally, causing left neural foraminal stenosis with slight flattening of the L5 nerve root.   Due to the impingement of Plaintiff's L5 nerve root, Plaintiff was treated with Methodone, and he was sent to pain specialists who gave him epidurals about three times a year.  The Methodone and epidurals alleviated the extreme pain.

Sometime in 2011, Dr. Barnett from Sacramento ordered doctors at CSP to reduce or eliminate all prescriptions for opiate pain medications.  In 2011, Plaintiff was taking 60 mgs. of Methodone, and he used a walker, a double mattress, and a wedge pillow.

Plaintiff used the walker in his cell, but on February 16, 2011, Lt. Ruiz [who is no longer a defendant in this case] ordered Officer Price to take the walker out of the cell, and from that time on, Plaintiff could only use the walker outside his cell.  This caused Plaintiff extreme pain at times, and he fell numerous times because he could not use the walker in his cell.

Plaintiff filed an inmate appeal concerning the walker.  On May 25, 2011, Plaintiff saw Dr. O. Beregovskaya, who purposely falsified Plaintiff's medical report attempting to defend the confiscation of the walker.  Dr. Beregovskaya did not examine Plaintiff but wrote that Plaintiff had a "normal exam," failing to confirm that Plaintiff was disabled due to back pain. (ECF No. 17 at 7:5-6).  Dr. Beregovskaya reduced Plaintiff's pain medication from 60 mgs. to 50 mgs. and denied the appeal.  Earlier, on April 25, 2011, Dr. Beregovskaya had examined Plaintiff and found abnormalities which corroborated an impingement of the nerve root.  At

that time, Dr. Beregovskaya concluded that Plaintiff needed the pain medication and noted that a reduction of medication caused Plaintiff extreme pain.

On July 26, 2011, Plaintiff saw Dr. Nareddy, who found that Plaintiff had tachycardia (a fast heart rate) of 120-130 per minute, and Plaintiff was sent to the E.R.  Dr. Nareddy falsified his report in an attempt to justify the eventual termination of Plaintiff's pain medication.  Dr. Nareddy knew that the results of the May 6, 2005 MRI justified treating Plaintiff with strong pain medication, but he wrote that the 2005 MRI showed "left neural feraminal stenosis at L5-SI with no impinging nerve."  (Id. at 7:25-26).  He also wrote that Plaintiff's most recent exams revealed complaints of pain disproportionate with the results of the exams.  Dr. Nareddy also lied about other things on his report.

On October 25, 2011, Plaintiff saw Dr. Nareddy, after repeatedly requesting an increase in pain medication to the level he received from 2007-2009.  Plaintiff told Dr. Nareddy about his impinged nerve root and increased pain.  Dr. Nareddy filled out a Pain Committee report, purposely falsifying it by writing that the 2005 MRI showed no impingement and no radiculopathy (radiating pain).  Yet on the 2005 MRI it states there is radiating pain.  Dr. Nareddy forced Plaintiff to do examination exercises which caused Plaintiff pain, then wrote that he thought Plaintiff was malingering.

On January 19, 2012, the Pain Committee claimed to have reviewed Plaintiff's medical file, yet made false reports about his condition.  On the same page that the Pain Committee reported that "there is apparently no radiation of the pain" and "[h]is back went out in 2005 and has been painful ever since with pain radiating down the left side."  (Id. at 8:23-25).  Dr. Wong [who is no longer a defendant in this case] was the head of the Pain Committee, which recommended that Plaintiff be taken off Methodone and that his walker, double mattress, and wedge pillow be taken away.

On January 27, 2012, Dr. Nareddy started to taper off Plaintiff's pain medication and ordered that Plaintiff go without the walker, double mattress, and wedge pillow.  When Plaintiff complained to Dr. Nareddy, Dr. Nareddy did not care.  Plaintiff's Methodone was reduced from 50 to 40 mgs., and within three days he was in extreme pain, could not sleep, and

had loose bowels.  On February 10, 2012, Plaintiff was told he would see a doctor on February 13, 2012, but on February 13, 2012, he was ignored.  Plaintiff had an episode of bladder incontinence.

On February 22, 2012, Plaintiff, using a wheel chair, saw Dr. Nareddy.  Plaintiff was in extreme pain.  Dr. Nareddy found that Plaintiff had tachycardia again and Plaintiff was sent to the E.R. where Dr. Nguyen said that the tachycardia was probably caused by Plaintiff's pain.  Dr. Nguyen ordered a slight increase of Methodone and prescribed Tylenol 3, but Plaintiff's Methodone was never increased.  Plaintiff filed medical requests explaining his pain, and Dr. Nareddy ignored them, purposely leaving Plaintiff in pain.

On February 29, 2012, Plaintiff fell and went to the E.R.  He was prescribed Tylenol 3 for a week or two but was still in pain.  Plaintiff saw PA Sisodia, Dr. Nareddy's assistant, concerning the first level of an appeal.  Plaintiff's pulse was 134 and his blood pressure was 139/91, but Plaintiff was not sent to the E.R.  Sisodia told Plaintiff that the Pain Committee had reported no impingement.  Plaintiff told Sisodia this was a lie and that Plaintiff would send her a copy of the 2005 MRI.  Plaintiff sent Sisodia a copy of his 2005 MRI an hour later.  Sisodia refused to give Plaintiff any pain medications or submit a request for an MRI and a specialist.

Plaintiff wrote to Dr. Nareddy explaining about the impingement and sent him a copy of the 2005 MRI.   On March 12, 2012, Plaintiff was scheduled to see Dr. Clark, but Dr. Clark refused to see him.

On March 16, 2012, Plaintiff blacked out due to extreme pain and lack of sleep, and hit his head on the sink and lacerated his forehead.  Plaintiff was taken to the E.R. and was placed in a holding cell in his wheelchair.  After about 15 minutes, Plaintiff requested to be taken out of the holding cell, but both nurses Kayun [who is no longer a defendant in this case] and B. Morean [who is no longer a defendant in this case] refused.  Plaintiff was in so much pain that he involuntarily urinated on himself.  After about 30 minutes, Plaintiff was in such pain that he slid out of the wheelchair so he could lie down, even if it was in his own urine.  The two nurses left Plaintiff there for another 3 or 3 1/2 hours.  When Plaintiff was examined by Dr. Aye, Dr. Aye found abnormalities in Plaintiff's exam, and prescribed a shot of Toredol and a week or

two of Tylenol 3 and Prednisone.  Plaintiff was scheduled to see the yard doctor (Dr. Nareddy) in one week.

On March 20, 2012, Plaintiff saw PA Sisodia and requested something for his pain, a new MRI, and consultation with a specialist.  She refused to treat the pain, but requested a new MRI and a specialist.  Dr. Beregovskaya denied Plaintiff's requests for an MRI and a specialist.

On March 27, 2012, Plaintiff blacked out again and fell, went to the E.R. and saw Dr. Aye.  Dr. Aye refused to do anything for Plaintiff's pain, saying that Dr. Nareddy was Plaintiff's yard doctor and so Dr. Nareddy would have to treat Plaintiff's chronic pain.  Plaintiff told Dr. Aye that Dr. Nareddy refused to see or help him, but Dr. Aye said his hands were tied.

On April 2, 2012, Plaintiff saw Dr. Clark who told Plaintiff that he had no authority to help Plaintiff get a new MRI or treat his pain.  Plaintiff showed him a copy of the 2005 MRI and he noted in his report that it showed left L5 flattening.

On April 8, 2012, Plaintiff started having problems with his right leg and could not get out of bed.  He asked the licensed vocational nurse to ask Dr. Nareddy to order a bedpan or urine bottle, but the nurse told Plaintiff that Dr. Nareddy refused to see or help him.  Plaintiff had to urinate and defecate off his bed while lying down, in extreme pain.

On April 10, 2012, Plaintiff was sent to the E.R. where Dr. Gil refused to treat his pain but sent him for an MRI.  However, Plaintiff only received a CT scan, which cannot show nerve impingements.  A CT scan with contrast would have shown nerve impingement, but the CT scan Plaintiff received was not done with contrast.

The results of the CT showed nothing wrong.  Plaintiff told Dr. Nareddy that that the results contradicted the 2005 MRI and told Dr. Nareddy he needed a new MRI, but Dr. Nareddy said, "you know that is not going to happen."  (Id. at 12:10-11).

Plaintiff developed chronic high blood pressure due to pain, but it went away after surgery when he was given Metoprodol.  Plaintiff continued writing to the federal receiver in Sacramento, and filed appeals and submitted medical requests almost every day.

Plaintiff was told he would see an ortho-specialist from CDCR, Dr. Williams [who is no longer a defendant in this case], via tele-med, so he wrote Dr. Williams a 10-page letter which

Dr. Williams admitted receiving. Thus, Dr. Williams knew about Plaintiff's medical history, the falsified report, and the 2005 MRI, but he refused to talk about it or go through Plaintiff's documents. He pretended that he had no clue what was wrong with Plaintiff and refused to order an MRI or a specialist, or prescribe pain medication. Additionally, Dr. Williams purposely falsified his report to support Dr. Nareddy.

Since February [Plaintiff failed to specify the year], Plaintiff had not gone to yard or taken a shower. He was bedridden and in extreme pain, but for eight months doctors Nareddy and Beregovskaya refused Plaintiff pain relief, his walker in his cell, MRIs, and surgical consultations.

Finally, someone in Sacramento ordered that Plaintiff be given a real physical examination, and the results were abnormal. Accordingly, Sacramento ordered that Plaintiff be given a new MRI. On July 30, 2012, Plaintiff was given an MRI, which showed left foraminal stenosis with impingement at L5, a bulge with impingement at L5, and two nodular densities at L2 and L4. On August 13, 2012, Plaintiff was given another MRI, with contrast, that found that the tumor at L4 was a benign hemangioma, but the tumor at L2 was found to displace nerve roots posteriorly. It was found that the tumor could be a hemangiomata, schwannoma, or malignant.

On August 27, 2012, Plaintiff had another MRI, with contrast, which found another benign tumor at T9. On September 28, 2012, Plaintiff saw neurosurgeon Dr. T. Wiebe, who recommended surgery. On November 27, 2012, Plaintiff had surgery. Afterward, Plaintiff was told that the tumor at L2 was growing inside a nerve root, and the right L5 had nerve impingement, which the MRIs did not show. By purposely refusing a new MRI for so long, defendants Nareddy and Beregovskaya attempted to prevent Plaintiff from corroborating his initial MRI. Defendants Nareddy and Beregovskaya knew from the May 6, 2005 MRI that Plaintiff had an impingement of the nerve root, and they knew he was in pain because he told them. They also knew Plaintiff had been treated for pain for the past 6-7 years by numerous doctors and specialists.

Plaintiff requests monetary damages and injunctive relief.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Albino v. Baca ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted.").  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Fed. R. Civ. P. 56(c).  If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the court must determine "whether a fair-minded jury could reasonably find for the [non-moving party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322.  "[C]onclusory allegations unsupported by factual data" are not enough to rebut a summary judgment motion.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1981)).

In reviewing a summary judgment motion, the Court may consider other materials in

the record not cited to by the parties, but is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party."  Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011).  It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact.  Celotex, 477 U.S. at 330 n. 2.  But, "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987)).

Additionally, the Court must liberally construe Plaintiff's filings because he is a *pro se* prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

## IV.   DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS ("SSUMF")[2]

1.   Plaintiff Steven Vlasich was involved in a motorcycle accident and a car accident when he was younger.  SSUMF 1; Excerpts of Transcript of Deposition of Steven Vlasich ("Vlasich Depo. Tr.") at 26:22-27:11.

2.   The accidents may have caused his lower back pain, which he has been dealing with since his "late teens early 20s."  SSUMF 2; Declaration of Dr. Nareddy, M.D. ("Nareddy Decl."), Exhibit A, p. 2; Vlasich Depo. Tr. at 19:7-11; 27:1-21.

3.   The lower back pain was aggravated in 2005 when Plaintiff was stretching.  SSUMF 3; Vlasich Depo. Tr. at 19:7-20.

---

[2] These facts are undisputed for the sole purpose of this motion.  The Court has compiled the summary of undisputed facts from Defendants' separate statement of undisputed facts and Plaintiff's response to Defendant's statement of disputed facts (ECF No. 41-3; ECF No. 48, pgs. 2-5), as well as the evidence submitted by Plaintiff.

4.  Plaintiff received a magnetic resonance imaging (MRI) of his lower spine on May 6, 2005 that showed "left neural foraminal stenosis with slight flattening of the L5 nerve root."  SSUMF 4; Nareddy Decl., Exhibit A, p. 1; Declaration of Dr. Olga Beregovskaya, M.D. in Support of Motion for Summary Judgment/Summary Adjudication ("Beregovskaya Decl.") ¶ 5.

5.  The 2005 Report also stated a diagnosis that "[d]egenerative facet joint disease is seen bilaterally."  SSUMF 5; Nareddy Decl., Exhibit A, p. 1.

6.  Degenerative facet joint disease can lead to chronic lower back pain but is seldom treated with anything other than pain management, including exercise and pain medication.  SSUMF 6; Beregovskaya Decl. ¶ 5.

7.  Plaintiff has no medical training nor has he taken any medical training courses.  SSUMF 9; Vlasich Depo. Tr. at 12:24-13:4.

8.  The degenerative disease and flattened nerve identified in the 2005 MRI report did not require surgery and no doctor prescribed surgery for Plaintiff prior to 2012.  SSUMF 10; Beregovskaya Decl. ¶ 5; Excerpt of Transcript of Deposition of Steven Vlasich on May 29, 2009, in Vlasich v. J. Neubarth, et al., Case No. 1:07-cv-01760-SMM, Exhibit B, at 27:3-5.

9.  It was Plaintiff who requested methadone after he complained he needed something stronger.  SSUMF 13; Vlasich Depo. Tr. at 30:22-31:10.

10. Dr. Neubarth reduced Plaintiff's methadone dosage from 80 mg to 60 mg.  SSUMF 14; Vlasich Depo. Tr. at 17:11-22.

11. Even while on the highest dose of methadone, 80 mg per day, Plaintiff continued to complain of lower back pain and difficulty getting in and out of his bunk and the shower.  SSUMF 15; Vlasich Depo. Tr. at 42:1-43:2; Nareddy Decl., Exhibit A, p. 2.[3]

12. According to Plaintiff, "at any given time" his pain could reach a level of 9 out

---

[3] Plaintiff only disputes this fact "insofar as at this time [Plaintiff] was only on 60gms methadone, not 80mgs."  (ECF No. 48 at 2:5).

of 10, even while on this high dosage.  SSUMF 16; Nareddy Decl., Exhibit A, p. 2; Vlasich Depo. Tr. at 42:11-43:2.[4]

13.    CDCR promulgated policies in the 2009 Pain Management Guidelines which restricted access to opioids only where the patient had a chronic and serious disease.  SSUMF 18; Clark Decl. ¶ 3.

14.    Defendant Dr. Beregovskaya was a physician at Corcoran during the 2011-2012 period.  SSUMF 22; Beregovksaya Decl. ¶ 3.

15.    Plaintiff has only seen Dr. Beregovskaya twice.  The first time was for a chronic care follow up appointment on April 25, 2011.  SSUMF 23; Vlasich Depo. Tr. at 49:24-50:6; 56:13-25; Beregovskaya Decl., ¶ 7.

16.    Dr. Beregovskaya was working in the emergency room of Corcoran's hospital, and was asked to see Mr. Vlasich because he had a scheduled appointment at the chronic care clinic and his regular primary care doctor was not available that day.  SSUMF 24; Beregovskaya Decl. ¶ 7.

17.    The second and only other time Plaintiff saw Dr. Beregovskaya was on or about May 24, 2011, when they discussed Plaintiff's 602 health care appeal of his walker being confiscated.  SSUMF 28; Beregovskaya Decl. ¶ 8; Nareddy Decl., Exhibit A, p. 7; Vlasich Depo. Tr. at 60:11-15; 60:23-25; 61:3-9.

18.    Plaintiff was told that his walker was removed from the cell because his "celly had a history of making weapons out of things."  SSUMF 29; Vlasich Depo. Tr. at 50:7-25.

19.    Inmate patients cannot have assistive devices such as a walker inside their cells unless they are medically verified as having a mobility impairment.  SSUMF 30; Beregovskaya Decl. ¶ 8.

20.    Plaintiff would have been allowed to have a walker inside his cell only if a medical provider verified his disability and completed a Form 1845, "Disability

---

[4] Plaintiff only disputes this fact "insofar as at this time [Plaintiff] was only on 60gms methadone, not 80mgs."  (ECF No. 48 at 2:5).

Placement Program Verification," identifying him in a category of "mobility impairment – with or without assistive device."   SSUMF 31; Beregovskaya Decl. ¶ 8 & Exhibit B.

21.    Plaintiff's methadone was reduced from 60 mgs to 50 mgs a day for 90 days. SSUMF 40; Nareddy Decl., Exhibit A, p. 9.

22.    Dr. Nareddy was not involved in Plaintiff's medical care until July 26, 2011, when he first saw Plaintiff for a chronic care appointment.  SSUMF 41; Nareddy Decl. ¶ 5; Nareddy Decl., Exhibit A, pgs. 10-11; Vlasich Depo. Tr. at 64:15-65:1.

23.    Plaintiff's appointment with Dr. Nareddy on July 26, 2011 was in response to his complaint of having his methadone tapered down to 50 mgs a day.  SSUMF 42; Nareddy Decl. ¶ 5; Nareddy Decl., Exhibit A, pgs.10-12.

24.    The next time Plaintiff saw Dr. Nareddy was on October 25, 2011.  SSUMF 47; Nareddy Decl., Exhibit A, p. 13; Nareddy Decl. ¶ 6.

25.    Plaintiff came into the clinic walking with a folded up walker, which Dr. Nareddy noted.  SSUMF 48; Nareddy Decl., Exhibit A, p. 13; Nareddy Decl. ¶ 6; Vlasich Depo. Tr. at 71:1-21.

26.    Dr. Nareddy assessed his lower back pain, including leg raising tests, observing his gait, and having him stand on his toes and heels.  SSUMF 49; Nareddy Decl., Exhibit A, p. 13; Nareddy Decl. ¶ 6.

27.    Dr. Nareddy also sent Plaintiff for assessment with a physical therapist, which the Pain Committee required to assess whether to reverse its decision to taper his medication.  SSUMF 54; Vlasich Depo. Tr. at 73:5-15; Nareddy Decl. ¶ 6.

28.    The physical therapist noted that Plaintiff carried his walker into the physical therapy session and wrote "? Need for walker."  SSUMF 56; Nareddy Decl., Exhibit A, p. 16.[5]

---

[5] While Plaintiff lists this fact as disputed, he does not seem to actually dispute this fact.  Instead, he states that he did not actually carry the walker into the room.

29.   The physical therapist also noted that Plaintiff had 0 atrophy in his muscle. SSUMF 57; Nareddy Decl., Exhibit A, p. 15.

30.   Plaintiff told the therapist he did not have problems eating.  SSUMF 58; Vlasich Depo. Tr. at 77:2-11.

31.   On January 27, 2012 Dr. Nareddy wrote instructions for Plaintiff's methadone to be tapered down from 50 mg, eventually to 2.5 mg a day, and to be completely off methadone within 70 days (by May 4, 2012) in accordance with the Pain Committee's decision.  SSUMF 63; Nareddy Decl., Exhibit A, p. 19.[6]

32.   Starting February 2012, Plaintiff began to submit numerous health care requests specifically asking for methadone.  SSUMF 64; Vlasich Depo. Tr. at 85:21-86:18.

33.   On February 22, 2012, Plaintiff was sent to the emergency room for suspected rapid or irregular heartbeats, tachycardia.  SSUMF 67; Nareddy Decl., Exhibit A, p. 20.

34.   On February 29, 2012, Plaintiff was seen in the emergency room for lower back pain and withdrawal from methadone and after he complained for falling. SSUMF 70; Nareddy Decl., Exhibit A, p. 21.

35.   Plaintiff also submitted a 602 health care appeal demanding that the doctors stop tapering down his methadone, but the appeal was denied by P.A. Sisodia. SSUMF 72; Nareddy Decl., Exhibit A, p. 22.

36.   Plaintiff then requested surgery and Physician's Assistant (P.A.) Sisodia submitted an MRI request on or about March 22, 2012 to see if there was a need for surgery.  SSUMF 73; Nareddy Decl., Exhibit A, p. 22.

37.   As the person designated by the Chief Medical Executive to approve requests for diagnostic services, Dr. Beregovskaya was responsible for approving or

---

[6] Plaintiff only disputes this fact "insofar as it implies that defendant was forced to abide by a recommendation he now claims he did not agree with." (ECF No. 48, p. 4).

denying requests for MRIs at Corcoran on March 28, 2012.   SSUMF 74; Beregovskaya Decl. ¶ 6.

38.   As per protocol, Dr. Beregovskaya relied on the information written in the request for services and did not need to physically examine Plaintiff in order to approve or deny the request.  SSUMF 75; Beregovskaya Decl. ¶ 6.

39.   In deciding whether to approve or deny requests for MRIs, Dr. Beregovskaya was required to apply the clinical findings of the treating medical staff (reported, observed, and verified symptoms) to a set of criteria called the InterQual criteria in order to determine whether a specific diagnostic test (such as an MRI) is warranted.  SSUMF 76; Beregovskaya Decl. ¶ 6.

40.   The InterQual standardized criteria are objective and are used in both private and community settings to evaluate and determine the need for diagnostic testing and treatment.  SSUMF 77; Beregovskaya Decl. ¶ 6.

41.   According to the InterQual standard, which prison doctors and non-prison doctors rely upon, an MRI is not given as a matter of routine diagnosis of lower back pain, but is given only for suspected nerve root compression in the lower back when the pain continues to worsen even after treatment with medication or reduced activities to alleviate pain.   SSUMF 78; Beregovskaya Decl. ¶ 6; Beregovskaya Decl., Exhibit A.

42.   On or about April 11, 2012, Plaintiff started complaining that he needed a urinal jug or bed pan and had to defecate and urinate from the side of his bed into cardboard cups because it was too painful to move.  SSUMF 81; Nareddy Decl., Exhibit A, p. 24.

43.   Dr. Nareddy read Plaintiff's CT scan on April 13, 2012 during a follow up appointment and saw it showing "multilevel spondylosis, very mild, but otherwise normal examination.   There were no fractures or dislocations." SSUMF 84; Nareddy Decl. ¶ 8; Nareddy Decl., Exhibit A, p. 26.

44. Dr. Nareddy renewed Plaintiff's prescription for Motrin 600 mg for 120 days. SSUMF 85; Nareddy Decl., Exhibit A, p. 28.

45. Dr. Nareddy also discussed his case with the Chief Medical Officer, Dr. Wang, so that Plaintiff's requests to reinstate his methadone to be "taken care of once from a higher authority."  SSUMF 87; Nareddy Decl. ¶ 8; Nareddy Decl., Exhibit A, p. 26.

46. Plaintiff was evaluated by a pain and rehabilitation specialist, Dr. Gabe Williams on May 9, 2012.  SSUMF 89; Nareddy Decl., Exhibit A, pgs. 30-32.

47. The only treatment Dr. Williams recommended for Plaintiff based on his assessment was mental health care to address any mental health problems. SSUMF 93; Nareddy Decl., Exhibit A, p. 32.

48. Plaintiff again asked for a second MRI on or about June 27, 2012.  SSUMF 94; Nareddy Decl., Exhibit A, p. 33.

49. P.A. Sidodia renewed pain medication for Plaintiff, NSAIDs 50 mg, for two months.  SSUMF 96; Nareddy Decl., Exhibit A, p. 35.

50. On July 20, 2012 Dr. Clark examined Plaintiff for symptoms related to his complaints of lower back pain.  SSUMF 97; Clark Decl. ¶ 6; Nareddy Decl., Exhibit A, p. 36.

51. Because Plaintiff had filed numerous complaints asking for methadone and for a second MRI, the Chief Medical Officer, Dr. McCabe asked Dr. Clark to address Plaintiff's complaints once and for all.  SSUMF 99; Clark Decl. ¶ 6.

52. Dr. Clark ordered a second MRI for Plaintiff on July 20, 2012.  SSUMF 100; Clark Decl. ¶ 6.

53. An MRI taken on July 30, 2012 revealed that Plaintiff had a 0.6 cm tumor in his lower spine, along with a "L5-S1 left-sided disc protrusion with narrowing of left lateral recess and left neural foramina with impingement of left exiting L[5] and left S1 nerve roots." SSUMF 101; Nareddy Decl., Exhibit A, p. 38.

54. Dr. Lori Karan, another primary care doctor, saw Plaintiff on or about September 14, 2012, to discuss his second MRI and his chronic lower back pain. SSUMF 102; Nareddy Decl., Exhibit A, pgs. 40-42.

55. Despite the MRI findings of a tumor and nerve impingement, Dr. Karan stated "there is no current indications for opioids unless the patient has malignant pain… The patient has been informed that he will not be given opioids unless this is recommended by the Pain Committee." SSUMF 105; Nareddy Decl., Exhibit A, p. 42.

56. Plaintiff underwent surgery to remove the tumor and discectomies, which relieved pain in his back in November 2012. SSUMF 106; Nareddy Decl., Exhibit A, pgs. 43-44.

## VI. PLAINTIFF'S CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS IN VIOLATION OF THE EIGTH AMENDMENT AGAINST DEFENDANTS' NAREDDY AND BEREGOVSKAYA

### A. <u>Defendants' Motion for Summary Judgment</u>

Defendants argue that "there is no evidence that either Dr. Nareddy or Dr. Beregovskaya knew but ignored Plaintiff's serious medical needs." (ECF No. 41-1, p. 6). Defendants also argue that they are both entitled to qualified immunity because "[t]heir decisions were clinically-based and reasonable, other doctors agreed with their approach, and there is no evidence that they knew they were doing anything wrong." (<u>Id.</u>).

Defendants' evidence includes excerpts from the transcript of Plaintiff's deposition that was taken on December 15, 2016 (ECF No. 41-3, pgs. 12-50), excerpts from the transcript of Plaintiff's deposition that was taken on May 29, 2009 (ECF No. 41-3, pgs. 52-55), the declaration of defendant Beregovskaya (ECF No. 41-4, pgs. 1-5), the InterQual 2012 Imaging Criteria (ECF No. 41-4, pgs. 7-8), copies of various healthcare appeals filed by Plaintiff (ECF Nos. 41-4, pgs. 13-32), the declaration of Dr. Edgar Clark (ECF No. 41-5, pgs. 1-5), the declaration of defendant Nareddy (ECF No. 41-6, pgs. 1-5), and copies of various medical records (ECF No. 41-6 pgs. 7-50).

### 1. Serious Medical Need

Defendants assert that Plaintiff did not have a serious medical need for a walker in his cell, methadone, or a second MRI.  (ECF No. 41-1, p. 14).

As to whether Plaintiff had a serious medical need for a walker in his cell, Defendants provide evidence that Plaintiff could not have a walker inside his cell unless he was medically verified as having a mobility impairment, which requires a medical provider to verify his disability and complete a Form 1845.  Beregovskaya Decl. ¶ 8 & Exhibit B.  According to Defendants, Plaintiff did not have this form in his file.  Vlasich Depo. Tr. at 52:24-53:3; 53:12-54:14; Beregovskaya Decl. ¶ 8 & Exhibit C.  Additionally, Plaintiff told a physical therapist that he could do pull-ups, limited upside-down push-ups, and burpees (Nareddy Decl., Exhibit A, p. 15), and was seen on several occasions carrying his folded-up walker or otherwise walking without the assistance of a walker (Beregovskaya Decl. ¶ 8; Nareddy Decl., Exhibit A, p. 7; Nareddy Decl. ¶ 5; Nareddy Decl.,  Exhibit A, pgs. 10-11; Nareddy Decl. ¶ 6; Nareddy Decl., Exhibit A, p. 13).

As to whether Plaintiff had a serious medical need for methadone, Defendants provide evidence that Plaintiff has been dealing with lower back pain since his "late teens to early 20s." SSUMF 2.  According to Defendants, "[t]he Corcoran Pain Committee, the emergency room staff, and [Plaintiff's] primary care providers found no demonstrated need for opioids to treat Plaintiff's chronic pain, both before and after he received a second MRI."  (ECF No. 41-1 p. 15; Nareddy Decl., Exhibit A, p. 4; Vlasich Depo. Tr. at 17:11-22; Clark Decl. ¶ 4; Nareddy Decl., Exhibit A, pgs. 8, 17-18, & 20); Clark Decl. ¶ 5; SSUMF 105).  Defendants also provide evidence that Plaintiff was able to eat normally (SSUMF 58) and perform some exercise (Nareddy Decl., Exhibit A, p. 15; Vlasich Depo. Tr. at 76:18-77:1).  Additionally, Defendants provide evidence that various medical providers who saw Plaintiff agreed that Plaintiff's complaints of pain were not consistent with the examination findings.  Nareddy Decl. ¶ 5; Nareddy Decl. Exhibit A, pgs. 10-11, 32, & 42.  Further, "[f]rom what Dr. Williams saw, Plaintiff's claimed inability to exercise was contradicted by the fact that Plaintiff appeared to have 'above average to superior bulk' stabilizing and core muscles, which are muscles used to

stabilize his lower back." (ECF No. 41-1, p. 12; Nareddy Decl., Exhibit A, p. 32). Defendants also point out that even while Plaintiff was on methadone he was still experiencing pain that could reach a level of 9 out of 10, and that Plaintiff still had difficulty getting in and out of his bunk and the shower. SSUMF 15 & 16.

As to whether Plaintiff had a serious medical need for an MRI, Defendants argue that the need for an MRI was not apparent at the time Plaintiff was seen and treated by Defendants. (ECF No. 41-1, p. 17). Defendants present evidence that Plaintiff received an MRI in 2005, which his medical providers reviewed, and his medical providers determined that no surgery was necessary because it only showed a degenerative disease. SSUMF 10. Defendants also present evidence that the findings of an MRI report do not necessarily dictate the course of treatment. Beregovskaya Decl. ¶ 5. If Plaintiff was able to manage his pain with exercise and medication, then the MRI report has no bearing on his treatment. Beregovskaya Decl. ¶ 5. "One of the key indicators of a need for an MRI was muscle atrophy" (ECF No. 41-1, p. 17), and both Defendants found no muscle atrophy when they examined Plaintiff. Clark Decl. ¶ 8; Nareddy Decl., Exhibit A, pgs. 5-6 & 10-11; Beregovskaya Decl. ¶ 7; Nareddy Decl. ¶¶ 5 & 6; Nareddy Decl., Exhibit A, p. 13. Additionally, Plaintiff's reflexes were within normal limits (Clark Decl. ¶ 4; Nareddy Decl., Exhibit A, p. 8), and a CT scan of Plaintiff's back taken in April of 2012 did not show anything abnormal or of concern (SSUMF 84; Nareddy Decl. ¶ 8). The reason Dr. Clark ordered a second MRI for Plaintiff is because the Chief Medical Officer instructed Dr. Clark to address Plaintiff's "numerous complaints and requests." (ECF No. 41-1, p. 17; SSUMF 99).

### 2. *Deliberate Indifference*

#### a. Dr. Nareddy

Defendants argue that there is no evidence that Dr. Nareddy was aware of Plaintiff's need for methadone or a second MRI and the he ignored that need. (ECF No. 41-1, p. 17). Defendants present evidence that defendant Nareddy had no involvement in Plaintiff's medical care until after the Pain Committee already began tapering Plaintiff's dosage of Methadone because it had decided that Plaintiff did not need methadone for his chronic lower back pain.

SSUMF 41 & 42.  Additionally, as discussed above, Defendants provide evidence that the information available to defendant Nareddy "did not show that Plaintiff needed methadone or a second MRI."  (ECF No. 41-1, p. 18).

Defendants also argue that defendant Nareddy tried to appease Plaintiff by asking the Pain Committee to reinstate Plaintiff's higher dosage of methadone in October of 2011, and asking the Chief Medical Officer to reinstate Plaintiff's methadone in April of 2012, "even though there was no clinical need for methadone."  (ECF No. 41-1, p. 18; Vlasich Depo. Tr. at 71:22-72:2; Nareddy Decl. ¶¶ 6 & 8; Nareddy Decl., Exhibit A, p. 26).  While defendant Nareddy could not get Plaintiff's methadone reinstated, he did renew Plaintiff's prescription for strong Motrin to address Plaintiff's pain.  SSUMF 85.

Additionally, Defendants argue that "there is no evidence that Dr. Nareddy was aware of but chose to ignore Plaintiff's complaints of pain and injury."  (ECF No. 41-1, p. 18).  Defendant Nareddy was not aware of all of Plaintiff's requests for medical treatment or complaints of injury, likely because these requests were screened out by nurses.  Vlasich Depo. Tr. at 86:19-23, 87:14-20, & 91:15-24; Nareddy Decl. ¶ 7.

Further, Defendants allege that there is no evidence that Plaintiff not receiving methadone resulted in harm to Plaintiff.  (ECF No. 41-1, p. 18).  Even though Plaintiff was not receiving methadone, he was receiving strong pain medication.  SSUMF 85 & 96.

Finally, Defendants argue that even if defendant Nareddy's refusal to order a new MRI harmed Plaintiff, it was an exercise of medical judgment, not deliberate indifference to a serious medical need.  (ECF No. 41-1, p. 19).

b.  Dr. Beregovskaya

Defendants argue that there is no evidence that defendant Beregovskaya was aware that Plaintiff might have had a medical need for a walker inside his cell at the time she denied Plaintiff's 602 appeal.  (ECF No. 41-1, p. 19).  Defendants provide evidence that there was nothing in Plaintiff's medical records that designated him as needing his walker inside his cell.  Vlasich Depo. Tr. at 52:24-53:3; 53:12-54:14; Beregovskaya Decl. ¶ 8.  Additionally, Defendants provide evidence that Plaintiff was able to walk unassisted during his 602 appeal

interview with defendant Beregovskaya in May of 2011.  Beregovskaya Decl. ¶ 8; Nareddy Decl., Exhibit A, p. 7.  Further, Defendants allege that Plaintiff was still on methadone at the time and was not going through withdrawals or complaining of falling down due to pain.  (ECF No. 41-1, p. 20).

Defendants also argue that to the extent Plaintiff claims that defendant Beregovskaya should have remembered that she had examined him the previous month, this allegation would at most support a claim of negligence, not deliberate indifference.  (ECF No. 41-1, p. 20).

Finally, Defendants allege that there is no evidence that defendant Beregovskaya was aware of Plaintiff's need for a second MRI.  (ECF No. 41-1, p. 20).  When defendant Beregovskaya reviewed Physician Assistant Sisodia's request for a second MRI, defendant Beregovskaya had not seen or interacted with Plaintiff for nearly a year.  SSUMF 74. Defendant Beregovskaya was not Plaintiff's primary care doctor, and she had no reason to review his medical file because her job was to rely solely on the information written in the request for services.  SSUMF 75.

### 3.  *Qualified Immunity*

Defendants argue that they are both entitled to qualified immunity, because the decisions they made were reasonable under the circumstances.  (ECF No 41-1, p. 20). According to defendants, "there [was] no clearly established law at the time suggesting that a provider must order treatment that is not clinically indicated, whether it is methadone, a second MRI, or access to a walker for use inside a prisoner cell."  (ECF No. 41-1, p. 21).  Defendants argue that, as described above, their actions were reasonable, and that there is no evidence that they departed from the standard of care in responding to Plaintiff's complaints.  (Id.). Additionally, "although Plaintiff alleges that Drs. Beregovskaya and Nareddy failed to properly review his medical records before treating him, at deposition Plaintiff conceded he had no direct proof of this."  (Id.; Vlasich Depo. Tr. at 122:5-123:11).

### B.  **Plaintiff's Opposition**[7]

---

[7] In this section the Court is summarizing Plaintiff's evidence.  The Court is not making a finding that any of the evidence summarized is admissible.

Plaintiff alleges that Defendants were deliberately indifferent, and asks that this case go before a trial of his peers.  (ECF No. 48, p. 1).

Plaintiff's evidence includes his declaration (ECF No. 41, p. 29), medical records (Id. at 44 (Exhibit A)); articles and texts relating to inmate health care service (Id. at 171 (Exhibit B)); medical texts (id. at 184-199 (Exhibit B)); appeals from Plaintiff regarding his health care and responses to his appeals regarding his health care (id. at 200 (Exhibit C); ECF No. 48-1, p. 46 (Exhibit G)); Correspondences from the Prison Law Office, including memorandums the Prison Law Office sent to the Receiver's Office of Legal Affairs, as well as a response from the Receiver's Office of Legal Affairs to a memorandum (ECF No. 41, p. 216 (Exhibit D)); Defendants' responses to Plaintiff's discovery requests (id. at 226 (Exhibit E)); letters from Plaintiff to various prison medical personnel and CDCR 22 forms, as well as responses from California Correctional Health Care Services (ECF No. 48-1, p. 27 (Exhibit F)); articles relating to back pain issues and excerpts from a guide on how to deal with chronic pain (id. at 121 (Exhibit H)); medical records from another inmate (id. at 135 (Exhibit I)); health care service requests (id. at 144 (Exhibit J)); excerpts from what appears to be the CDCR's 2009 Pain Management Guidelines (id. at 215 (Exhibit K)); the declaration of inmate Michael Dorrough (id. at p. 250); the declaration of inmate John Leitao (id. at p. 251); and the declaration of inmate Perry Avila (id. at p. 252).

Plaintiff also provides a statement of disputed facts (ECF No. 41, p. 2), a statement of contested and uncontested facts as to defendant Beregovskaya's (id. at 6), a statement of contested and uncontested facts as to defendant Nareddy (id. at 12), his own statement of uncontested facts (id. at 23), and what the Court construes as a memorandum of points and authorities (id. at 38).  The Court notes that these filings are signed under penalty of perjury (id. at pgs. 5, 11, 22, 28, & 42).  Therefore, the allegations therein that are based on Plaintiff's personal knowledge and set forth as facts that would be admissible in evidence must be treated as evidence.[8]

---

[8] "[B]ecause [Plaintiff] is pro se, we must consider as evidence in his opposition to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions are based on personal

*1.   Summary of General Evidence and Arguments*

Plaintiff alleges that he had a serious injury since at least 2004.   Plaintiff's Memorandum of Points and Authorities ("Plaintiff's MPA"), ECF No. 48, p. 38.   According to Plaintiff, he "was treated for severe back pain by three pain specialists and a plethora of prison doctors from 2004 to 2011."  Id.  The three pain specialists all treated Plaintiff for his severe pain that radiated to his left buttock and hip.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 23.  In fact, on September 19, 2008, a specialist, Dr. Palenica, ordered the prison doctors to prescribe 80 mgs of methadone indefinitely.  Plaintiff's MPA, ECF No. 48, p. 40.

Plaintiff alleges that Defendants and their co-conspirators then "decided to re-write Plaintiff[']s whole medical history, including but not limited to claiming the 2005 MRI showed no impingement…."  Plaintiff's MPA, ECF No. 48, p. 38.  Plaintiff alleges that because of this case, defendant Nareddy was fired and defendant Beregovskaya was transferred to a different prison.  Id.

Plaintiff alleges that, contrary to Defendants' claim, he never complained of pain at a level of 9 out of 10 while on 80 mgs of methadone.  Plaintiff's MPA, ECF No. 48, p. 40.  He only complained of that level of pain when his methadone was cut to 60 mgs.  Id.

Plaintiff alleges that, contrary to Defendants' claim, his Deep Tendon Reflexes ("DTRs") were not normal on numerous occasions, and on one occasion defendant Nareddy even wrote "Patellar Reflexes Nil."  Plaintiff's MPA, ECF No. 48, p. at 41.

Plaintiff alleges that from 2005 to 2011, his condition continued to deteriorate.  Plaintiff's Declaration, ECF No. 48, p. 29.  He would have pain go down his leg sometimes.  Id.  He started to have some numbness on his left thigh.  Id.  It was not until Plaintiff's methadone was tapered that he started to notice that his pain was more along the lines of pins and needles, and burning.  Id.

---

knowledge and set forth facts that would be admissible in evidence, and where [Plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct."  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (citing McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir.1987).

Plaintiff alleges that, contrary to Defendants' assertion, when Plaintiff saw the physical therapist on January 18, 2012, he told the physical therapist that he could not do upside-down push-ups or burpees.  Plaintiff's Declaration, ECF No. 48, p. 31.   Plaintiff also never carried his walker into the room, never did any leg raises, and never told the physical therapist that he could do 200 pushups per day.  Id.; Nareddy Decl., Exhibit A, p. 32.  Plaintiff also cites to the physical therapy evaluation report to show that he never told the physical therapist that he could do 200 push-ups a day.  Nareddy Decl., Exhibit A, p. 15.

Plaintiff alleges that he told Defendants that his 2005 MRI showed impingement caused by stenosis, that he had diminished DTRs, abnormal L5 dermatome, that a plain CT scan could not show stenosis, and that a new MRI was necessary.  Plaintiff's MPA, ECF No. 48, p. 40.  Plaintiff further alleges that everything he told Defendants turned out to be correct.  Id.

Plaintiff alleges that "Ricky Barnett told all the doctors in 2011-2012 to discontinue the use of opioids for pain unless the prisoner has cancer."  Plaintiff's MPA, ECF No. 48, p. 38.  Plaintiff further alleges that defendants failed to follow their own pain management guidelines.  Id.  Plaintiff cites to Franklin v. Dudley, No. 2:07-CV-2259 FCD KJN, 2010 WL 5477693 (E.D. Cal. Dec. 29, 2010), adhered to, No. 2:07-CV-2259 KJM KJN, 2011 WL 2493770 (E.D. Cal. June 22, 2011), Strain v. Sandham, No. CIV S05-0474GEBGGHP, 2009 WL 172898 (E.D. Cal. Jan. 23, 2009), report and recommendation adopted, No. 2:05CV0474GEBGGH-P, 2009 WL 500728 (E.D. Cal. Feb. 26, 2009), and Chess v. Dovey, No. CVS-07-1767 LKK DAD, 2011 WL 567375 (E.D. Cal. Feb. 15, 2011), report and recommendation adopted, No. CIV S-07-1767 LKK, 2011 WL 1219268 (E.D. Cal. Mar. 30, 2011), for the proposition that "a blanket policy denying narcotic pain medication to inmates in the general population regardless of medical need is unconstitutional."  Plaintiff's MPA, ECF No. 48, p. 38.

Plaintiff alleges that he had a verified disability, and that he used his walker, not because he needed it to walk, but for better stability.  Plaintiff's MPA, ECF No. 48, p. 39; Plaintiff's Exhibit G, ECF No. 48-1, pgs. 69-73.

Plaintiff alleges that on September 28, 2012, he saw a non-CDCR doctor, Dr. Wiebe.  That doctor immediately recognized his symptoms, found them to be credible and consistent

with Plaintiff's new MRI results, and recommended surgery.  Plaintiff's Declaration, ECF No. 48, p. 36;  Plaintiff's Exhibit A, ECF No. 48, pgs. 141-143.

Plaintiff alleges that he had surgery on November 27, 2012.  The surgeon, Dr. Wiebe, found that "the L5 and S1 nerve roots had erythema along their nerve root sleeves, consistent with chronic impingement and inflammation."  Plaintiff's Exhibit A, ECF No. 48, p. 149.

Plaintiff argues that Defendants should not be entitled to qualified immunity, because when the incidents occurred, "any doctor would know… that attempting to re-write a prisoners [sic] medical history with flagrant falsifications to adhere to an underground policy of no opioids unless a prisoner has cancer was illegal & unconstitutional."  Plaintiff's MPA, ECF No. 48, p. 42.

On numerous occasions Plaintiff attempts to interpret medical records, criteria, and manuals, and also states what he believes his course of treatment should have been.

### 2.  *Summary of Evidence Related to Defendant Beregovskaya*

Plaintiff alleges that on July 21, 2010, Dr. Brar issued him a walker instead of a cane. Plaintiff's Declaration, ECF No. 48, p. 30.  Plaintiff also alleges that he had an Americans with Disabilities Act ("ADA") disability that had been verified by the ADA coordinator.  Id.

Plaintiff alleges that he was allowed to have his walker in his cell until February 16, 2011, when it was confiscated and left outside his cell (for use only outside the cell).  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 23.  Plaintiff appealed this action, and was interviewed by defendant Beregovskaya.  Id.  Plaintiff explained to defendant Beregovskaya that he needed the walker for support in his cell, especially when his symptoms flared up. Defendant Beregovskaya never did a physical evaluation of Plaintiff.  Id.  The only examination Plaintiff believes she did is observe Plaintiff come and go.  Id.  Plaintiff's appeal was denied.  Id.

On that same day (but in a different document) defendant Beregovskaya wrote that Plaintiff claimed to be disabled, but that her physical exam did not confirm Plaintiff's claim. Id. at p. 24.  Plaintiff alleges his symptoms were mostly accurately noted from 2005 until that day, when defendant Beregovskaya falsified her report by writing that she did a P.E. physical

examination of Plaintiff, and that it was normal.  Plaintiff's Declaration, ECF No. 48, p. 30.

Prior to being seen by defendant Beregovskaya for his appeal, Plaintiff had a medial appointment with her (SSUMF 23).  Plaintiff submitted as evidence defendant Beregovskaya's report regarding this appointment.  According to the report, Plaintiff had chronic low back pain, Plaintiff was continued on his 60 mg dose of methadone, the pain was well controlled on the treatment regimen, and Plaintiff "[a]mbulate[d] with a walker."  Plaintiff's Exhibit A, ECF No. 48, pgs. 73-74; Plaintiff's Contested and Uncontested Facts as to Defendant Beregovskaya, ECF No. 48, p. 6.  The report also recommended that Plaintiff's treatment regimen continue. Plaintiff's Exhibit A, ECF No. 48, pgs. 73-74

Plaintiff alleges that on July 8, 2011, defendant Beregovskaya decreased his Methadone for false reasons.  Plaintiff's Declaration, ECF No. 48, p. 37.

Plaintiff alleges that on March 21, 2012, Plaintiff saw PA Sisodia, who submitted two RFSs for MRI and specialty services.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 25.  On or about March 27, 2012, defendant Beregovskaya denied them both, claiming that neither fit the IQ criteria.  Id.

Plaintiff alleges that defendant Beregovskaya "approved many MRIs that did not fit the IQ criteria, yet disapproved Plaintiff[']s that did fit the IQ criteria."  Plaintiff's MPA, ECF No. 48, p. at 41.

Plaintiff alleges that defendant Beregovskaya did not follow guidelines, policies, and criteria in her treatment of Plaintiff.  Plaintiff's Contested and Uncontested Facts as to Defendant Beregovskaya, ECF No. 48, pgs. 6-8 & 11.  Plaintiff also alleges that defendant Beregovskaya violated CDCR policy by not allowing Plaintiff to have his walker in his cell. Id. at p. 7.

Plaintiff also alleges that, contrary to defendant Beregovskaya's assertion that she only saw Plaintiff once in the Treatment and Triage area, she actually saw Plaintiff twice (once on April 25, 2011, and once on May 25, 2011).  Plaintiff's Contested and Uncontested Facts as to Defendant Beregovskaya, ECF No. 48, p. 10.

      *3.   Summary of Evidence related to Defendant Nareddy*

Plaintiff alleges that when he saw defendant Nareddy on July 26, 2011, he was sent to the emergency room immediately after answering defendant Nareddy's questions as to why he might have an extremely fast heart rate.  Plaintiff's Declaration, ECF No. 48, p. 30.  According to Plaintiff, contrary to defendant Nareddy's assertions, defendant Nareddy did not do any examination of Plaintiff.  Id.  Defendant Nareddy also falsely stated that Plaintiff was walking with his walker in his hand.  Id.

Plaintiff alleges that in the July 26, 2011 report, defendant Nareddy wrote "MRI done in 2005 showed left neural foraminal stenosis at L5-S1 with no impinging nerve," yet the 2005 MRI states "with slight flattening of the L5 nerve root."  Plaintiff's Contested and Uncontested Facts as to Defendant Nareddy, ECF No. 48, p. 15.  Additionally, defendant Nareddy wrote in the report that the 2005 MRI showed no radiculopathy.  However, the 2005 MRI clearly stated "Indication: low backpain [sic] for three weeks left hip and leg pain.  [L]eft lower extremity numbness."  Id.

Plaintiff alleges that he saw defendant Nareddy again on October 25, 2011, to try to get his methadone reinstated to 80 mgs a day.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 24.  Defendant Nareddy attempted to get Plaintiff's DTRs on the knee caps, and they were nil.  Id.  Plaintiff was in extreme pain while defendant Nareddy had him do different exercises, which at times caused Plaintiff to shake with the effort.  Id.  Plaintiff alleges that during the appointment defendant Nareddy told Plaintiff that he was going to help Plaintiff get his methadone restored to 80 mgs per day, and that it was going to be easy because of Plaintiff's extensive history with all the specialists Plaintiff had seen.  Plaintiff's Declaration, ECF No. 48, p. 31.  Not once did defendant Nareddy indicate to Plaintiff that he believed Plaintiff was malingering.  Id.

Plaintiff alleges he submitted a sick-call slip almost every day from February of 2012 until the end of the ordeal.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 24.

Plaintiff accuses defendant Nareddy of interfering with another doctor's attempt to prescribe Plaintiff methadone.  Plaintiff's Contested and Uncontested Facts as to Defendant Nareddy, ECF No. 48, p. 19.  Plaintiff alleges that On February 22, 2012, Plaintiff was sent to

the emergency room for tachycardia. Id. Plaintiff was seen by Dr. Nguyen, who stated that he thought Plaintiff's tachycardia might be related to Plaintiff's pain issues, and told Plaintiff that he would increase Plaintiff's methadone for the withdrawals and prescribe Tylenol 3 for five days. Id. However, Plaintiff never received the increase in methadone because defendant Nareddy spoke with Dr. Nguyen and had him revise his report. Id. Plaintiff alleges that after returning to the prison on February 22, 2012, defendant Nareddy refused to see Plaintiff. Id.

Plaintiff alleges that, on February 29, 2012, he was told that defendant Nareddy was working and refused to see Plaintiff. Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 24. Later that day, Plaintiff blacked out and hit his head. Id. Plaintiff went to the ER and received an X-Ray. Id.

Plaintiff alleges that (on an unspecified date) he was seen by RN Ratliff, who said that she asked defendant Nareddy to give Plaintiff a new MRI. Id. at 25. Defendant Nareddy said that Plaintiff is to get nothing. Id. Nareddy also told Ratliff that there was nothing wrong with Plaintiff. Id.

Plaintiff alleges that on April 9, 2012, he was unable to put any pressure on either foot, so he could not walk. Id. He was pulled out on a stretcher, and LVN Amobie called the emergency room. Id. However, "they" refused to see Plaintiff, so he was dumped him back on his bed. Id. Amobie tried to get Plaintiff a bedpan & urinal jug, but Amobie told Plaintiff that defendant Nareddy told Amobie that Plaintiff had nothing coming. Id. So, Plaintiff had to urinate and defecate off his bed into cardboard cups. Id.

Plaintiff alleges that on April 10, 2012, he saw Dr. Gill, because defendant Nareddy refused to see him. Plaintiff's Declaration, ECF No. 48, p. 34.

Plaintiff alleges that on April 13, 2012, Plaintiff saw defendant Nareddy. Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 25. Defendant Nareddy did not treat Plaintiff. Id. Instead, defendant Nareddy tried to "rub [Plaintiff's] nose in the CT results that failed to []show [Plaintiff's] foraminal stenosis…." Plaintiff's Declaration, ECF No. 48, p. 34. Plaintiff told defendant Nareddy that he needed a new MRI, and defendant Nareddy replied that Plaintiff was never going to get a new MRI and that nothing was wrong with Plaintiff. Id. Defendant

Nareddy then told officers to take Plaintiff's walker and double mattress, but the CMO overrode defendant Nareddy's decision.  Id.  On the report of the visit, defendant Nareddy wrote that Plaintiff submitted numerous 7362 forms calling doctors sadists.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 25; Plaintiff's Exhibit A, ECF No. 48, p. 118.

Plaintiff alleges that defendant Nareddy knew that NSAIDs did not help Plaintiff anymore and that Plaintiff needed Methadone.   Plaintiff's MPA, ECF No. 48, p. 41.  Plaintiff also alleges that defendant Nareddy never attempted to have Plaintiff's methadone increased to 80 mgs.  Id.

Plaintiff alleges that a similarly situated prisoner was given an MRI by defendant Nareddy because defendant Nareddy thought it was "better to have a MRI report before we schedule him for pain intake."  Plaintiff's Contested and Uncontested Facts as to Defendant Nareddy, ECF No. 48, p. 20.

Plaintiff alleges that defendant Nareddy knew of Plaintiff's pain because of the sick call slips that Plaintiff "put in every day," many of which have defendant Nareddy's name on them. Id. at p. 22.

Plaintiff alleges that defendant Nareddy wrongfully accused him of "malingering." Plaintiff's Contested and Uncontested Facts as to Defendant Nareddy, ECF No. 48, p. 16.

Plaintiff alleges that RN Ratliff told Plaintiff that defendant Nareddy knew Plaintiff was having back problems, but told her that Plaintiff had nothing coming and that he was mad at Plaintiff for calling him a sadist and a liar.  Plaintiff's Declaration, ECF No. 48, p. 37.  Plaintiff also submitted the declaration of two inmates, both of whom state that, while at the medical clinic, when Plaintiff's name was called they heard defendant Nareddy say that he is not giving Plaintiff anything.  Declaration of Michael Dorrough, ECF No. 48-1, p. 250; Declaration of Perry Avila, ECF No. 48-1, p. 252.

Plaintiff alleges that defendant Nareddy did not follow guidelines, policies, and criteria in his treatment of Plaintiff.  Plaintiff's Contested and Uncontested Facts as to Defendant Nareddy, ECF No. 48, pgs. 12, 15, 16, 18, & 22.  Plaintiff also accuses defendant Nareddy of intentionally falsifying medical reports.  See, e.g., id. at pgs. 17-18 & 21.

C.   **Legal Standards**

*1. Section 1983*

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.   "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"   Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law.   Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law").   A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'"   Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)).   "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms."   Preschooler II, 479 F.3d at 1183 (quoting Johnson, 588 F.2d at 743).   This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause."

Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

2.   <em>Deliberate Indifference to Serious Medical Needs</em>

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006), (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).   This requires a plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." Id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), overruled on other grounds WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted).

Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted).   Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation.   Farmer v. Brennan, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

Deliberate indifference to a prisoner's serious medical needs can be found when a defendant "intentionally interfer[es] with treatment once prescribed." Estelle, 429 U.S. at 105. Deliberate indifference can also be found when a defendant "deliberately ignore[s] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner." Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992), overruled in part on other grounds as recognized in Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Toguchi, 391 F.3d at 1058.  Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106.

### 3.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In determining whether defendants are entitled to qualified immunity, the Court must decide (1) whether the facts shown by plaintiff make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.  Pearson, 555 U.S. at 232.

To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'"  Reichle v. Howards, 132 S. Ct. 2088, 2090 (2012) (quoting Al–Kidd, 563 U.S. at 741) (alteration in original).  This immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

**D.    Discussion**

### 1.  Evidentiary Objections

Defendants have made objections to Plaintiff's evidence, which the Court has carefully reviewed.  To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be admissible.  It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment.  This is particularly true when "many of the objections are boilerplate recitations of evidentiary

principles or blanket objections without analysis applied to specific items of evidence." <u>Capital Records, LLC v. BlueBeat, Inc.</u>, 765 F.Supp.2d 1198, 1200 n.1 (C.D.Cal. 2010) (quoting <u>Doe v. Starbucks, Inc.</u>, No. SACV 08–0582 AG (CWx), 2009 WL 5183773, at *1 (C.D.Cal. Dec. 18, 2009)).

However, the Court will address several evidentiary issues.  The Court will not consider as evidence Plaintiff's attempts to interpret medical records, criteria, and manuals, or his statements regarding what he believes his exact course of treatment should have been.  It is undisputed that Plaintiff has no medical training or education.  SSUMF 9; Vlasich Depo. Tr. at 12:24-13:4.   The interpretation of medical records, criteria, and manuals, as well as the determination of the appropriate course of treatment, involves matters that are scientific, technical, or require other specialized knowledge.  Accordingly, Plaintiff may not testify as to these matters as a lay witness.  Fed. R. Evid. 701.  Additionally, as Plaintiff has no medical training or education, and based on the record appears to have has no medical experience, Plaintiff does not qualify as an expert witness, and therefore cannot testify to these matters as an expert witness.  Fed. R. Evid. 702.  The Court notes that while it will not consider Plaintiff's attempts to interpret medical records, it will consider Plaintiff's medical records themselves as evidence.

The Court also notes that it will not consider the declaration from Michael Dorrough (ECF No. 48-1, p. 250), but it will consider the declaration from Perry Avila (<u>id.</u> at 252).  Defendants object to both declarations on the grounds that the witness did not swear to his statement being true and correct, and that certain statements that are made are irrelevant and lack foundation "because it is unclear whether Dr. Nareddy is heard addressing Plaintiff's chronic back pain problems, or whether it pertains to another medical issue that is not the subject of this lawsuit."  (ECF No. 51, p. 3-4).

To be admissible, a declaration must be subscribed by the declarant as true under penalty of perjury, in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.  Executed on (date). (Signature)."  28 U.S.C. § 1746(2).

Mr. Dorrough's declaration states "I Michael Reed Dorrough do declare that…."  ECF No. 48-1, p. 250.  Because Mr. Dorrough did not sign his declaration under penalty of perjury and did not state that his statements were true and correct, the Court will not consider Mr. Dorrough's declaration as evidence.  "Although a lack of swearing to the declaration may not be a fatal defect, the declaration must be made under penalty of perjury and must be attested to be true."  Weldon v. Anaya, No. 115CV00856DADMJS, 2017 WL 1349005, at *2 (E.D. Cal. Apr. 6, 2017) (citing Cobell v. Norton, 310 F.Supp.2d 77, 84 (D.D.C. 2004).

Mr. Avila states "I Perry Robert Avila declare under penalty of perjury that:…."  ECF No. 48-1, p. 252.  While Mr. Avila does not use the words "the following is true and correct," that exact phrase is not necessary.  28 U.S.C. § 1746(2).  See also Soto v. Castlerock Farming & Transp., Inc., No. 1:09-CV-00701 AWI, 2011 WL 2680839, at *4, n. 6 (E.D. Cal. July 8, 2011) (overruling an objection to a declaration even though the declaration did not include the phrase "under penalty of perjury").  Given that Mr. Avila made his declaration under penalty of perjury, that it appears that Mr. Avila implied that his statements were true and correct, that a declaration only needs to "substantially" match the language in 28 U.S.C. § 1746(2), and that the Court must liberally construe Plaintiff's filings because he is a *pro se* prisoner (Thomas, 611 F.3d at 1150), the Court finds that the language used in the declaration is sufficient to satisfy 28 U.S.C. § 1746(2).

As to Defendants' argument that Mr. Avila's declaration is irrelevant and lacks foundation "because it is unclear whether Dr. Nareddy is heard addressing Plaintiff's chronic back pain problems, or whether it pertains to another medical issue that is not the subject of this lawsuit" (ECF No. 51, p. 3-4), the Court finds that this objection lacks merit.  Mr. Avila's declaration describes an incident that occurred on March 1, 2012, at the 4B yard medical clinic.  ECF No. 48-1, p. 252.  One of the statements in Mr. Avila's declaration is "I also heard [Dr. Nareddy] tell a correction officer that he did not want Vlasich to have a cane."  Id.  Based on the facts provided by the parties, the reason Plaintiff had medical devices to assist in walking was because of issues with Plaintiff's back.  Accordingly, it appears that this medical visit related at least in part to medical issues that are the subject this lawsuit.  Therefore, Mr.

Avila's testimony that he heard defendant Nareddy say "I don't want anyone to give Vlasich anything" is relevant and does not lack foundation.

Accordingly, the Court will consider Mr. Avila's declaration.

Finally, the Court notes that Plaintiff submitted evidence regarding doctors besides Defendants. However, those doctors are not currently defendants, and Plaintiff has not filed a motion for reconsideration or for leave to amend his complaint. Accordingly, the Court will only consider that evidence to the extent that it is relevant to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.

### 2. *Defendant Beregovskaya*

#### a. Serious Medical Need

"[W]e have identified three situations in which a medical need is serious: (1) '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment'; (2) 'the presence of a medical condition that significantly affects an individual's daily activities'; or (3) 'the existence of chronic and substantial pain.'" Egberto v. Nevada Dep't of Corr., 678 F. App'x 500, 503 (9th Cir. 2017) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled in part on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

The Court finds that, at the very least, there is a genuine dispute of fact as to whether Plaintiff had a serious medical need.

Defendants provided evidence that they (and other doctors) did not believe that Plaintiff was in as much pain as he was reporting. However, it is undisputed that Plaintiff had back pain, and that it was aggravated in 2005. SSUMF 2 & 3. Additionally, Plaintiff has submitted a substantial amount of evidence that he had chronic and substantial pain when he saw Defendants, and that the pain significantly affected his daily life. Plaintiff has sworn under penalty of perjury that he had back pain for years, that from 2005 to 2011 his condition continued to deteriorate, and that the pain was substantial. He has also explained how the pain affected his daily life.

Plaintiff has also provided medical records that corroborate at least some of his

testimony.  As one example, Plaintiff submitted evidence that he did in fact need treatment.  On September 28, 2012, Plaintiff saw a non-CDCR doctor, Dr. Wiebe.  Plaintiff's Declaration, ECF No. 48, p. 36; Plaintiff's Exhibit A, ECF No. 48, pgs. 141-143.  That doctor recognized Plaintiff's symptoms, found them to be credible and consistent with Plaintiff's new MRI results, and recommended surgery.  Plaintiff's Declaration, ECF No. 48, p. 36;  Plaintiff's Exhibit A, ECF No. 48, pgs. 141-43.  Plaintiff also submitted evidence that he had the surgery on November 27, 2012.  Plaintiff's Exhibit A, ECF No. 48, pgs. 149-50.  The surgeon, Dr. Wiebe, found that "the L5 and S1 nerve roots had erythema along their nerve root sleeves, consistent with chronic impingement and inflammation." Id. at 149.

Accordingly, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff had a serious medical need.

b.  Deliberate Indifference

The more difficult question is whether defendant Beregovskaya was deliberately indifferent to Plaintiff's serious medical need.  Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." Toguchi, 391 F.3d at 1057 (emphasis added) (citation and internal quotation marks omitted).

Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted).  Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation.  Farmer, 511 U.S. at 836-37 & n.5 (citations omitted).

Much of Plaintiff's evidence is inadmissible.  He routinely alleges what non-defendant medical staff told him they were told by Defendants, which is largely hearsay.  Also, as discussed above, Plaintiff routinely attempts to interpret medical information (including the IQ criteria), which he is not qualified to do.

Plaintiff also attempts to rely on the medical records of other inmates to show that

defendant Beregovskaya was deliberately indifferent to Plaintiff's serious medical needs. However, even if the Court were to consider those records as admissible evidence, those records are not particularly helpful to Plaintiff. The fact that two other inmates, whose medical histories appear to be different than Plaintiff's, received different treatments than Plaintiff does not show that Defendants were deliberately indifferent to Plaintiff's serious medical needs.

However, despite all of the irrelevant and admissible evidence that Plaintiff submitted, he also submitted relevant admissible evidence. Plaintiff had a medical appointment with defendant Beregovskaya on April 25, 2011. SSUMF 23. Plaintiff submitted as evidence defendant Beregovskaya's report regarding this appointment. According to the report, Plaintiff had chronic low back pain, Plaintiff was continued on his 60 mg dose of methadone, the pain was well controlled on the treatment regimen, and Plaintiff "[a]mbulate[d] with a walker." Plaintiff's Exhibit A, ECF No. 48, pgs. 73-74; Plaintiff's Contested and Uncontested Facts as to Defendant Beregovskaya, ECF No. 48, p. 6. The report also recommended that Plaintiff's treatment regimen continue. Plaintiff's Exhibit A, ECF No. 48, pgs. 73-74.

It is undisputed that Plaintiff saw defendant Beregovskaya again on May 24, 2011, when she interviewed Plaintiff to determine whether Plaintiff should be allowed to have his walker in his cell. SSUMF 28. Plaintiff has submitted evidence, in the form of his verified testimony, that she did not perform a physical examination of Plaintiff before deciding that Plaintiff should not be allowed to have his walker. Plaintiff's Declaration, ECF No. 48, p. 30. Additionally, defendant Beregovskaya admitted that she did not do an extensive physical evaluation of Plaintiff on this date. (ECF No. 48, p. 228).

While this alone might not be enough to create a genuine dispute of material fact regarding whether defendant Beregovskaya was deliberately indifferent to Plaintiff's serious medical needs, Plaintiff has also submitted evidence that she subsequently lied on medical records by saying that she did a physical evaluation, and that the falsifications made Plaintiff's condition appear to be less serious than it was. Plaintiff's Declaration, ECF No. 48, p. 30; Plaintiff's Exhibit A, ECF No. 48, p. 48. Evidence has also been submitted that this allegedly falsified report was in fact later used to Plaintiff's detriment when doctors were considering his

treatment.  <u>See, e.g.</u>, Plaintiff's Exhibit A, ECF No. 48, pgs. 81-82 & 86-87; Nareddy Decl., Exhibit A, p. 10.

Based on the admissible evidence, the Court finds that there is a genuine dispute of material fact regarding whether defendant Beregovskaya was deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff has submitted evidence that defendant Beregovskaya knew of Plaintiff's back pain, and in fact at first continued Plaintiff on his 60 mg dose of methadone, stating that "the pain is well controlled on present treatment regimen." Defendant Beregovskaya also noted that Plaintiff "ambulates with a walker."  According to Plaintiff's version of events, despite these acknowledgements, and without examining Plaintiff, she later decided that Plaintiff did not need a walker in his cell.  Then, she falsified a medical report to make Plaintiff's medical needs appear less serious than they actually were, and the medical report was used to Plaintiff's detriment.

### c.  Qualified Immunity

The Court finds that defendant Beregovskaya is not entitled to summary judgment on the issue of qualified immunity.

As analyzed above, Plaintiff has made out a violation of his Eighth Amendment rights. Further, it is clearly established that prison officials violate an inmate's Eighth Amendment rights if they are deliberately indifferent to a prisoner's chronic and substantial pain. <u>McGuckin v. Smith</u>, 974 F.2d at 1059-60.  Based on the evidence presented by Plaintiff, Plaintiff was in chronic and substantial pain, and defendant Beregovskaya knew it.  However, she refused to allow Plaintiff to have his walker in his cell, and made it more difficult for him to receive necessary medical treatment by falsifying his medical records.  Every reasonable official would know that these actions violate an inmate's Eighth Amendment rights.

Accordingly, the Court will recommend that the motion for summary judgment be denied as to defendant Beregovskaya.

### 3.  *Defendant Nareddy*

### a.  Serious Medical Need

As analyzed above, the Court finds that, at the very least, there is a genuine dispute of fact as to whether Plaintiff had a serious medical need.

### b. Deliberate Indifference

As discussed above, much of Plaintiff's evidence is inadmissible.  However, Plaintiff has submitted admissible evidence regarding defendant Nareddy's alleged deliberate indifference.

Plaintiff has submitted evidence that he saw defendant Nareddy on October 25, 2011.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 24.  Defendant Nareddy attempted to get Plaintiff's DTRs on the knee caps, and they were nil.  Id.  Plaintiff was in extreme pain while defendant Nareddy had him do different exercises, which at times caused Plaintiff to shake with the effort.  Id.  During the appointment, defendant Nareddy told Plaintiff he was going to help Plaintiff get his methadone restored to 80 mgs per day, and that it was going to be easy because of Plaintiff's extensive history with all the specialists Plaintiff had seen.  Plaintiff's Declaration, ECF No. 48, p. 31.  Despite saying he was going to help Plaintiff, defendant Nareddy then wrote in his report that Plaintiff might be malingering.  Plaintiff's Exhibit A, ECF No. 48-1, p. 37.

Plaintiff has submitted evidence that defendant Nareddy refused to treat Plaintiff, without even attempting to determine whether Plaintiff had a medical issue that needed treatment.  Declaration of Perry Avila, ECF No. 48-1, p. 252.

Plaintiff has submitted evidence that defendant Nareddy falsified medical records by stating that he examined Plaintiff even though he did not, and that Plaintiff was walking with his walker in his hand even though Plaintiff was using his walker.  Plaintiff's Declaration, ECF No. 48, p. 30.  Plaintiff has also submitted evidence that this allegedly falsified report was in fact later used to his detriment when doctors were considering his treatment.  Plaintiff's Exhibit A, ECF No. 48, pgs. 86-87.[9]

---

[9] It appears that at least one of the allegedly false reports was also used to Plaintiff's detriment in a health care appeal related to whether Plaintiff should be allowed to have his walker in his cell.  Beregovskaya Decl., Exhibit C.

Plaintiff has submitted evidence that on April 13, 2012, Plaintiff saw defendant Nareddy.  Plaintiff's Alleged Uncontested Facts, ECF No. 48, p. 25.  However, defendant Nareddy did not call Plaintiff down to treat him.  Id.  Instead, Plaintiff believes that defendant Nareddy tried to "rub [Plaintiff's] nose in the CT results that failed to []show [Plaintiff's] foraminal stenosis…."  Plaintiff's Declaration, ECF No. 48, p. 34).  Plaintiff told defendant Nareddy that he needed a new MRI, and defendant Nareddy replied that Plaintiff was never going to get a new MRI and that nothing was wrong with Plaintiff.  Id.  Defendant Nareddy then told officers to take Plaintiff's walker and double mattress.  Id.

Based on the admissible evidence, the Court finds that there is a dispute of material fact regarding whether defendant Nareddy was deliberately indifferent to Plaintiff's serious medical needs.  According to Plaintiff's version of events, defendant Nareddy knew of Plaintiff's back pain.  However, instead of helping Plaintiff, on at least one occasion defendant Nareddy flat out refused to provide Plaintiff with any medical assistance, without even examining Plaintiff first.  On another occasion, instead of providing treatment that Plaintiff needed, he met with Plaintiff just to tell him that his CT results failed to show that he needed treatment.  On top of this, defendant Nareddy falsified Plaintiff's medical records, and those medical records were later used to Plaintiff's detriment.

c.  Qualified Immunity

The Court finds that defendant Nareddy is not entitled to summary judgment on the issue of qualified immunity.

As analyzed above, Plaintiff has made out a violation of his Eighth Amendment rights.  Further, it is clearly established that prison officials cannot be deliberately indifferent to a prisoner's chronic and substantial pain.  McGuckin v. Smith, 974 F.2d at 1059-60.  Based on the evidence presented by Plaintiff, Plaintiff was in chronic and substantial pain, and defendant Nareddy knew it.  However, defendant Nareddy refused to treat Plaintiff on one occasion, and on another occasion saw Plaintiff for the sole purpose of telling Plaintiff that Plaintiff was not going to get treatment.  Additionally, defendant Nareddy falsified Plaintiff's medical records,

making it more difficult for Plaintiff to get the medical treatment he needed.  Every reasonable official would know that these actions violate an inmate's Eighth Amendment rights.

Accordingly, the Court will recommend that the motion for summary judgment be denied as to defendant Nareddy.

**IX.    CONCLUSION AND RECOMMENDATIONS**

Based on the foregoing, the Court finds that there is a genuine dispute of material fact as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs, and that Defendants are not entitled to summary judgment on the issue of qualified immunity. Accordingly, IT IS HEREBY RECOMMENDED that Defendants' motion for summary judgment, filed on March 7, 2017, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven (7) days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __July 25, 2017__                    ___/s/___ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE