# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN VLASICH,<br><br>                    Plaintiff,<br><br>      v.<br><br>DR. C. NAREDDY and DR. O. BEREGOVSKAYA,<br><br>                    Defendants. | Case No. 1:13-cv-00326-LJO-EPG (PC)<br><br>PRETRIAL ORDER<br><br>Motions *in Limine*<br>Filing Deadline:         November 7, 2018<br><br>Motions *in Limine*<br>Response Deadline:  November 21, 2018<br><br>Motions *in Limine*<br>Hearing:                  TBD, if necessary<br><br>Jury Trial:          Date: Dec. 18, 2018<br>                        Time: 8:30 a.m.<br>                        Dept.: 4 (LJO) |

Steven Vlasich ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action filed pursuant to 42 U.S.C. § 1983. This action now proceeds on Plaintiff's Second Amended Complaint, against defendants Dr. C. Nareddy and Dr. O. Beregovskaya ("Defendants") on a claim for inadequate medical care in violation of the Eighth Amendment. (ECF Nos. 17, 18, 21, & 22).

The parties have submitted pretrial statements, and on October 17, 2018, the Court held a telephonic trial confirmation hearing. Plaintiff appeared on his own behalf, and Amie Mctavish and Erick Rhoan of the Office of the Attorney General appeared on behalf of Defendants.

Having reviewed the statements and the remainder of the file, and having considered the issues raised at the telephonic trial confirmation hearing, the Court issues the instant pretrial order.

## I. <u>Jurisdiction and Venue</u>

The Court has subject matter jurisdiction over this action. 28 U.S.C. § 1331. Venue is

proper because the conduct allegedly occurred in this judicial district.  28 U.S.C. § 1391.

**II.**     **Trial**

The parties demand a trial by jury.  Fed. R. Civ. P. 38(b).

Trial is set for **December 18, 2018, at 8:30 a.m.**, before the Chief District Judge Lawrence J. O'Neill in Courtroom 4 (LJO).  The jury trial is expected to last 3-4 days.

**III.**    **Facts**

**A.**     **Undisputed Facts**

**Plaintiff contends that the following facts are undisputed:**

1. Plaintiff had a serious back problem from 2005 until surgery in 2012.  That surgery caused permanent neuropathy, and a progression of the disease caused Plaintiff to have spinal stenosis all down his lumbar spine.  He now has mild, moderate, and severe stenosis, that causes him severe pain.

2. Plaintiff's May 5, 2005 MRI showed at L5-S1 degenerative facet joint disease bilaterally which caused left neural foraminal stenosis <u>with</u> slight flattening of the L5 nerve root.

3. Plaintiff was given numerous modalities to help with the pain, including, but not limited to, LESIs, trigger shots, Parafonforte, Baclofen, Neurontin, Vicodin, Tylenol 3, Methadone, etc…

4. Plaintiff saw a multitude of doctors, including pain specialists, prison doctors, and he was put up for Corcoran's Pain Committee in 2006 and retained on Methadone.  All these doctors agreed that Plaintiff needed a strong opioid for his severe pain.

5. Stenosis symptoms are very dynamic, and the symptoms change based upon progression of disease, weight bearing, walking, standing upright, etc…

6. Plaintiff's pain medication was reduced from 80 mgs of Methadone to 60 mgs, then from 60 mgs to 50 mgs, then to zero.

7. Plaintiff kept his cane, then later kept his walker, in his cell without problems until February 16, 2011, when his walker was confiscated and left outside of his cell.  On March 25, 2011, defendant Beregovskaya denied Plaintiff's appeal to possess

2

his walker inside his cell.

8. In late 2011 Plaintiff took his walker back inside his cell because he was having problems with his stability.

9. On April 25, 2011, defendant Beregovskaya saw Plaintiff and found abnormal neurological findings. She noted that he told her that his pain radiated from his back to his left buttock on this day. The pain was worse with prolonged standing and sitting. She continued Plaintiff on the 60 mgs of methadone, because in her professional opinion Plaintiff's pain was well controlled.

10. On May 25, 2011, defendant Beregovskaya wrote a RFS for G. Williams in which she wrote that Plaintiff claimed to be disabled, but the "PE" did not confirm his claim.

11. On June 1, 2011, Dr. Clark wrote a report based almost entirely on the April 25, 2011 report. Based upon Dr. Clark's June 1, 1011 report, defendant Beregovskaya reduced Plaintiff's methadone by 10 mgs, to 50 mgs.

12. On July 26, 2011, Plaintiff saw defendant Nareddy for the first time. Plaintiff had a very fast pulse rate (Tachycardia). He was sent to the ER almost immediately, where he laid down on a bed.

13. On October 25, 2011, Plaintiff saw defendant Nareddy for the second time. Defendant did a pain intake where he made Plaintiff do all types of painful exercises, which made him shake with the effort.

14. On December 13, 2011, Dr. Karan, who is on the Pain Committee, wrote on a CDCR 128-C3 chrono that Plaintiff was "being tapered from methadone."

15. On July 19, 2012, the Corcoran Pain Management Committee recommended, based entirely on Defendant's July 26, 2011 and October 25, 2011 reports, that Plaintiff's methadone be tapered to zero, and all of his other modalities be taken as well.

16. On January 27, 2012, defendant Nareddy started to taper Plaintiff's methadone.

17. Plaintiff submitted sick-call slips almost every day from February 2012 until October 2012.

18. Plaintiff suffered from severe withdrawal symptoms, which entailed cold sweats, achy joints, black-outs, high pulse rate and blood pressure, and Plaintiff was bedridden from February 2012 through October 2012.

19. On February 22, 2012, Plaintiff went to the ER for high pulse rate. Dr. Nguyen thought it was related to Plaintiff's pain issues. He told Plaintiff he would increase his methadone, yet that never happened. He did prescribe Tylenol 3 for withdrawals after the Tachycardia resolved itself by lying down on the bed.

20. On February 29, 2012, Plaintiff was told that defendant Nareddy was working and refused to see him. Later that day Plaintiff blacked out and hit his head. He went to the ER and received an x-ray, and was given Tylenol 3 for his pain.

21. On March 1, 2012, Plaintiff saw PA Sisodia. His BP was 139/91 and his pulse rate was 134. She told Plaintiff that the Pain Committee wrote that his MRI showed no impingement. He sent her a copy of his 2005 MRI underlining the portion that showed the slight flattening of his L5 nerve root.

22. On March 13, 2012, Plaintiff's BP was 107/58.

23. On March 14, 2012, Plaintiff's pulse rate was 100.

24. On March 16, 2012, Plaintiff blacked out again and split his forehead open. He saw Dr. Aye, who noted that Plaintiff had no deep tendon reflexes. He prescribed Plaintiff a shot of Toradol, Tylenol 3, and Prednisone.

25. Plaintiff saw RN Ratliff who said she asked defendant Nareddy to give Plaintiff a new MRI, and he told her that Plaintiff was to get nothing, and also told her there was nothing wrong with Plaintiff.

26. On March 21, 2012, Plaintiff saw PA Sisodia, who submitted two RFS for a MRI and Ortho. On or about March 27, 2012, defendant Beregovskaya denied them both based on the IQ Criteria.

27. On March 26, 2012, Plaintiff saw RN Ratliff. His BP was 130/78. She requested Plaintiff's Tylenol 3 be extended, but Dr. Clark refused.

28. On March 27, 2012, Plaintiff blacked out and hit his forehead. Plaintiff told Dr.

4

Aye how defendant Nareddy kept ignoring him. Dr. Aye said he would write defendant Nareddy an e-mail telling him to stop ignoring Plaintiff.

29. On March 30, 2012, RN Ratliff washed out Plaintiff's forehead wound because it got infected due to the negligence of the medical staff.

30. On April 2, 2012, Plaintiff saw Dr. Clark, who refused to tell him who was on the Pain Committee. Plaintiff's BP was 140/90 with a pulse rate of 106. Plaintiff brought a copy of his 2005 MRI and showed it to him and he admitted that it showed impingement.

31. On April 6, 2012, RN Ratliff told Plaintiff that Dr. Clark was working on three cases, including Plaintiff's case. Also that he was going to get at headquarters to fix the problem. Plaintiff had a BP of 150/90.

32. On April 9, 2012, Plaintiff was unable to put any pressure on his feet. His right leg was as painful as his left leg. LVN Amobe called the ER after Plaintiff was taken out on a stretcher. They refused to see Plaintiff, so he was dumped back on his bed in his cell. LVN Amobie tried to get a bed pan and urinal jug from Dr. Nareddy, but he refused to help. Thus Plaintiff had to urinate and defecate off his bed.

33. On April 10, 2012, Plaintiff could not get anyone to help in the morning, but the 3rd Watch Lieutenant coerced the ER to see Plaintiff. He saw Dr. Gill. He could not elicit any DTRs. He told Plaintiff that he would send him out for a new MRI, yet all he received was a plain CT scan. Plaintiff found out later that Dr. Gill wrote that Plaintiff was to receive an MRI, then crossed it out, then wrote CT with contrast, but Plaintiff never received any contrast.

34. On April 13, 2012, defendant Nareddy called Plaintiff down to tell him how there was nothing wrong with him and the CT scan proved it, etc…. This defendant ignored Plaintiff for two months and only called him down to rub his nose in the CT results.

35. On May 9, 2012, Plaintiff saw G. Williams, MD. Plaintiff's BP was 141/104, and pulse rate was 109. Plaintiff sent him a 10-page letter explaining all the

falsifications etc… that had happened, he said he got the letter, yet he refused to even talk about it.  He then proceeded to write a report to coincide with Defendants' false narrative.  Plaintiff requested a new MRI, and he said no.

36. The Prison Law Office tried to help Plaintiff by writing the Receiver's Office, who elicited a response from Corcoran's higher medical staff, who tried to cover for the Defendant's errors, but their answers were full of false information.  PLO lawyer Alison Hardy wrote a memo on June 4, 2012, that thoroughly impugned the July 19, 2012 Pain Committee report, and also stated that Plaintiff's 2005 MRI showed flattening, which suggests impingement.

37. On July 10, 2012, Plaintiff saw Dr. Clark, who refused to do a physical exam because he claimed to be in fear for his safety, even though Plaintiff was in handcuffs.  He noted that Plaintiff was upset that he did not get an MRI on April 10, 2012, but only received a plain CT scan, even though the order said a CT with contrast.

38. On July 20, 2012, Dr. Clark called Plaintiff to the ER and told Plaintiff that he was ordered to give a full and impartial physical examination.  He correctly wrote that the 2005 MRI showed a flattened L5 nerve root.  He noted that the pain went down into both legs, buttocks, down to the feet.  He also noted that Plaintiff had two episodes of incontinence.  Plaintiff's BP was 147/36 (sic).  He found zero DTRs at the knees and ankles.  He also noted that Plaintiff had a give-way weakness in his left great toe.  His conclusion was chronic low back pain and possible left L5 radiculopathy.

39. On August 23, 2012, August 30, 2012, and September 14, 2012, Plaintiff saw Dr. Karan, who was on the Corcoran Pain Committee.  Plaintiff had problems with this doctor like the others going back to Defendants.  She wrote false information in his medical reports like Plaintiff "only recently stated he had left radicular symptoms." She also wrote that Plaintiff had "high blood pressure since June of 2012," but Plaintiff has complained of left radicular symptoms since 2005 and had high BP

6

since February 2012.  She also said there is <u>no current</u> indication for opioid unless the patient has <u>malignant pain</u>.

40. Plaintiff had three separate new MRIs (July 30, 2012, August 13, 2012, and August 27, 2012).  These scans all corroborated Plaintiff's 2005 MRI, showing neuro-foraminal stenosis at his left side which caused an impingement at L5-S1 with a bulge.  They also found a tumor at L1-L2.  None of this was found on the CT scan on April 10, 2012.

41. On September 28, 2012, Plaintiff saw neurosurgeon Dr. T. Wiebe.  He found all of Plaintiff's symptoms in line with what one would feel if he had a severe problem with his nerve roots.

42. On November 27, 2012, Dr. Wiebe operated on Plaintiff.  He wrote that he needed "increased procedural services are indicated for extensive removal of osteophytes at the caudal L5 level, impinging the neural elements, and a broad intervertebral disk herniation at L5-S1 was appreciated, contributing to impingement of the traversing S1 nerve root and also impinging the exiting L5 nerve root in the lateral foramen, where there was an osteophytic lip rostral to the disk, impinging the exiting L5 Nerve root."  He also found "similar findings at the right side."  He noted that the L5 & S1 nerve roots had "erythema along their nerve root sleeves, consistent with <u>chronic impingement</u> and inflammation"!

43. Plaintiff never saw Dr. Karen, PA Sisodia, or either defendant after his surgery.  Plaintiff believes that was also the last time he saw Dr. Clark.  Plaintiff had no problem with receiving 90 mgs methadone a day until 2016 when once again CDCR used an underground policy to take his opioid, while doctors falsified his medical file once again at CSP-SAC this time.

**Defendants contend that the following facts are undisputed:**

On May 6, 2005, after aggravating the pain while doing stretches, Plaintiff received an MRI of his lower spine that showed "left neural foraminal stenosis with slight flattening of the L5 nerve root."

The 2005 Report also stated Plaintiff had "[d]egenerative facet joint disease is seen bilaterally."

Degenerative facet joint disease can lead to chronic lower back pain, but it is seldom treated with anything other than pain management, including exercise and pain medication.

The degenerative disease and the flattened nerve identified in the 2005 MRI report did not require surgery, and no doctor prescribed surgery for Plaintiff until 2012.

Even while on a high dose of methadone, Plaintiff continued to complain of lower back pain and difficulty getting in and out of his bunk and the shower.

CDCR promulgated policies in the 2009 Pain Management Guidelines which restricted access to opioids only where the patient had chronic and serious disease.

Defendant Dr. Beregovskaya was a physician at Corcoran during the 2011-2012 period.

Plaintiff has only seen Dr. Beregovskaya twice, the first time was for a chronic care follow up appointment on April 25, 2011.

Dr. Beregovskaya was working in the emergency room of Corcoran's hospital, and was asked to see Mr. Vlasich because he had a scheduled appointment at the chronic care clinic and his regular primary care doctor was not available that day.

The second and only other time Plaintiff saw Dr. Beregovskaya was on or about May 24, 2011, when they discussed Plaintiff's 602 health care appeal of his walker being confiscated.

Plaintiff was told that his walker was removed from the cell because his "celly had a history of making weapons out of things."

Inmate patients cannot have assistive devices such as a walker inside their cells unless they are medically verified as having a mobility impairment.

Plaintiff would have been allowed to have a walker inside his cell only if a medical provider verified his disability and completed a Form 1845, "Disability Placement Program Verification," identifying him in a category of "mobility impairment – with or without assistive device."

There was no Form 1845 found in Plaintiff's medical file authorizing him to have a walker in his cell.

1    During the assessment on May 24, 2011, Dr. Beregovskaya observed that Plaintiff was
2    able to walk without assistance of the walker.

3    Plaintiff's 602 appeal was denied because he did not have a Form 1845, "Disability
4    Placement Program Verification," in his medical file.

5    On May 25, 2011, Dr. Beregovskaya authored a Request for Services (RFS) for Plaintiff
6    see Dr. Gabe Williams, a pain and rehabilitation specialist.

7    On June 1, 2011, the Corcoran Pain Committee, which included Corcoran doctor, Dr.
8    Edgar Clark (but not Dr. Beregovskaya or Dr. Nareddy) made the decision to taper his medication
9    from 60 mgs to 50 mgs per day for 90 days.

10   Plaintiff's methadone was tapered from 60 mgs to 50 mgs per day for 90 days.

11   Neither Dr. Beregovskaya or Dr. Nareddy participated in any Pain Committee decision to
12   taper Plaintiff off methadone.

13   Dr. Nareddy was not involved in Plaintiff's medical care until July 26, 2011, when he first
14   saw Plaintiff for a chronic care appointment.

15   Plaintiff's appointment with Dr. Nareddy on July 26, 2011 was in response to his
16   complaint of having his methadone tapered down to 50 mgs a day.

17   The next time Plaintiff saw Dr. Nareddy was on October 25, 2011.

18   Plaintiff came into the clinic walking with a folded up walker, which Dr. Nareddy noted.

19   Dr. Nareddy assessed his lower back pain, including leg raising tests, observing his gait,
20   and having him stand on his toes and heels.

21   Dr. Nareddy also sent Plaintiff for assessment with a physical therapist, which the Pain
22   Committee required to assess whether to reverse its decision to taper his medication.

23   The physical therapist also noted that Plaintiff had 0 atrophy in his muscle.

24   During the evaluation, the physical therapist noted that Plaintiff reported being able to do
25   pull-ups even though he was on a tapered down dose of 50 mgs of methadone a day.

26   Plaintiff admits he could walk without the walker.

27   On March 1, 2012, Plaintiff saw PA Sisodia for a first level appeal regarding an increase in
28   Methadone. The appeal was denied by P.A. Sisodia.

1      Plaintiff did not have a medical appointment with Dr. Nareddy on March 1, 2012.

2      Plaintiff then requested surgery and Physician's Assistant (P.A.) Sisodia submitted an MRI

3  request on or about March 22, 2012 to see if there was a need for surgery.

4      As the person designated by the Chief Medical Executive to approve requests for

5  diagnostic services, Dr. Beregovskaya was responsible for approving or denying requests for

6  MRIs at Corcoran on March 28, 2012.

7      As per protocol, Dr. Beregovskaya relied on the information written in the request for

8  services and did not need to physically examine Plaintiff in order to approve or deny the request.

9      In deciding whether to approve or deny requests for MRIs, Dr. Beregovskaya was required

10  to apply the clinical findings of the treating medical staff (reported, observed, and verified

11  symptoms) to a set of criteria called the InterQual criteria in order to determine whether a specific

12  diagnostic test (such as an MRI) is warranted.

13      The InterQual standardized criteria are objective and are used in both private and

14  community settings to evaluate and determine the need for diagnostic testing and treatment.

15      According to the InterQual standard, which prison doctors and non-prison doctors rely

16  upon, an MRI is not given as a matter of routine diagnosis of lower back pain, but is given only

17  for suspected nerve root compression in the lower back when the pain continues to worsen even

18  after treatment with medication or reduced activities to alleviate pain.

19      The MRI request was denied by Dr. Beregovskaya on March 28, 2012 because it did not

20  meet the InterQual criteria.

21      Dr. Nareddy read Plaintiff's CT scan on April 13, 2012 during a follow up appointment

22  and saw it showing "multilevel spondylosis, very mild, but otherwise normal examination. There

23  were no fractures or dislocations."

24      Dr. Nareddy renewed Plaintiff's prescription for Motrin 600 mg for 120 days.

25      Plaintiff was evaluated by the specialist, Dr. Gabe Williams on May 9, 2012.

26      The only treatment Dr. Williams recommended for Plaintiff based on his assessment was

27  mental health care to address any mental health problems.

28      Plaintiff asked for a second MRI again on or about June 27, 2012.

1   In July of 2012, Dr. Clark ordered a second MRI for Plaintiff because Dr. McCabe, the
2   Chief Physician and Surgeon at the time, asked Dr. Clark to address Plaintiff's numerous
3   complaints once and for all.

4   An MRI taken on July 30, 2012 revealed that Plaintiff had a 0.6 cm tumor in his lower
5   spine, along with a "L5-S1 left-sided disc protrusion with narrowing of left lateral recess and left
6   neural foramina with impingement of left exiting L% [sic] and left S1 nerve roots."

7   Dr. Lori Karan, another primary care doctor, saw Plaintiff on or about September 14, 2012
8   to discuss his second MRI and his chronic lower back pain.

9   Dr. Karan noted that she had examined Plaintiff on August 23, 2012 and that he had no
10  atrophy in his legs.

11  Despite the MRI findings of a tumor and nerve impingement, Dr. Karan stated "there is no
12  current indications for opioids unless the patient has malignant pain. The patient has been
13  informed that he will not be given opioids unless this is recommended by the Pain Committee."

14  Plaintiff underwent surgery to remove the tumor and discectomies, which relieved pain in
15  his back in November 2012.

16  **B.**     **Disputed Facts**

17  **Plaintiff contends that the following facts are disputed:**

18      1.  CDCR's Pain Management Guidelines (2009) lists a recent imaging scan as a
19          criterion for being treated with an opioid, thus it obviously dictates the course of
20          action in this case.

21      2.  Prior to seeing defendant Nareddy Plaintiff's primary care doctor treated him with
22          all different types of modalities, including Vicodin and Methadone.

23      3.  Dr. Neubarth never determined that Plaintiff never needed a strong pain medication
24          for his lower back pain, because he was part of Corcoran's Pain Committee in 2006
25          that found Plaintiff needed Methadone.

26      4.  Plaintiff never complained of pain at a level of 9 out of 10 while on 80 mgs a day.

27      5.  Corcoran's Pain Committee was never tasked with the responsibility for
28          determining the patient's clinically-demonstrated need for opioids to treat pain.

6.  The Pain Committee's decision whether to use opioids to treat a patient is a recommendation only, as it states, and CDCR doctors have the absolute right to prescribe whatever they want as long as they deem it medically necessary, as one only has to look at Drs. Nguyen and Arya who both prescribed Methadone after the Committee recommended to taper!

7.  While Defendants contend that well developed leg muscles and core muscles are indicators that the nerves are not being pinched or compressed, because pinched nerves often lead to muscle atrophy, their own IQ Criteria 2012 Imaging Criteria Notes (5) states that compression usually affects the sensory neurons of the nerve root first, causing pain and paresthesia. Motor neurons are somewhat less vulnerable, and are usually affected later or in more severe compression.

8.  While Defendants allege that a CT scan is equal to an MRI, their own IQ Criteria for imaging scans noted that the MRI is the initial study of choice for suspected nerve root compression, whether caused by disc disease, tumor, or metastatic disease. This is in line with their Pain Management Guidelines 2009, which also states the MRI as the optimal technique, while the CT can only be used in spinal stenosis if the patient is given contrast. Which is why Dr. Gill ordered the CT with contrast on April 10, 2012.

9.  Plaintiff's condition obviously worsened since the 2005 MRI since Plaintiff's DTRs were going steadily down.

10. Plaintiff had been given the walker after his case was taken. He was forced to take the walker or nothing. Plaintiff had all the documentation he needed to have the walker in his cell. If anything it was the defendant's negligence that led to Plaintiff not having an 1845. As for not being allowed to have it in his cell, Corcoran's OP 1023 gives Plaintiff full authority to have the walker in his cell.

11. While Defendants both claim that they were not part of the Pain Committee decision to taper Plaintiff off Methadone, they were the whole reason the Committee did what it did. It is quite obvious that the committee already reached

its decision at least as far back as December 13, 2011, when Dr. Karan wrote that Plaintiff was to be tapered off Methadone.

12. On July 26, 2011, defendant Nareddy never examined Plaintiff. He never independently did DTRs, he never explained to Plaintiff that his complaints of pain did not match the physical exam etc…, and he never told Plaintiff that his Methadone had to be tapered because it was bad for his heart.

13. On October 25, 2011, defendant Nareddy did some physical examination where he had Plaintiff do some exercises, which caused Plaintiff a lot of pain. He never received good reflexes on Plaintiff's knees. In fact, he wrote Plaintiff's "patellar reflexes nil" on this date, thus he cannot even keep his facts straight in one report.

14. In both the above reports defendant Nareddy wrote Plaintiff's 2005 MRI showed no impingement. During discovery he claimed that he could not substitute impingement for compression or pinched nerve, yet he freely used compression for impingement later in discovery, and both he and Dr. Clark used pinched nerve their declarations in support of summary judgment!

15. On January 18, 2012, Plaintiff never carried his walker into the PT room, never told him that he did limited upside down push-ups, burpees, or 200 push-ups a day.

16. On January 19, 2012, the Pain Committee had already made up their mind and did not come to any independent decision. Almost all of Corcoran's higher medical staff were extremely corrupt, including Drs. Clark, Karan, Wang, McCabe, and Defendants.

17. On February 22, 2012, defendant Nareddy interfered with Dr. Nguyen's order for a Methadone increase because he wanted to keep Plaintiff in severe pain.

18. Defendant Beregovskaya did not apply the IQ Criteria correctly when she screened out two of Plaintiff's RFSs for MRI and Ortho. The RFS for MRI had the IQ Criteria attached to the RFS with the exact criteria circled.

19. On April 10, 2012, Dr. Gill sent Plaintiff for a MRI, which he had to scratch, when he wrote for Plaintiff to receive a CT with contrast. Yet Plaintiff only received a

plain CT, which failed to show his spinal stenosis, which he had been diagnosed with since 2005! In fact, it failed to show Plaintiff's bulge in his disc or the tumor in his spine. So Defendants can save their lies about a plain CT being as good as an MRI. That is not to mention the IQ Criteria in the notes state quite clearly that "MRI is the initial study of choice for suspected nerve root compression…." As defendant Beregovskaya stated in her declaration for summary judgment, the IQ Criteria are objective and are used in both private and community settings… etc….

20. On March 9, 2012, Dr. Williams, who was just as corrupt as Corcoran's medical staff, attempted to coverup for Defendants and the rest by falsifying his report to coincide with the false narrative created by Defendants. Williams had a habit of falsifying reports to deprive patients of needed modalities, etc….

21. On June 20, 2012, Dr. Clark found weakness in Plaintiff's L5 nerve root distribution by Plaintiff's great left toe dorsiflexor weakness, as shown in the IQ Criteria notes (7), yet he has the audacity to claim in his declaration for summary judgment that he found no weakness.

22. On August 23, 2012, Dr. Karan did not find good muscle strength in all Plaintiff's toes. "Would not resist my pressure[]+ dorsiflex his left big toe good muscle stength [sic] at all other toes." So how can defendant Nareddy claim otherwise in his undisputed material facts in summary judgment at 103.

23. Defendants cannot even review Plaintiff's medical record for this court without making egregious errors, yet they have claimed in summary judgment that Plaintiff has no evidence proving that they failed to properly review his medical records!

**Defendants contend that the following facts are disputed:**

Whether or not Dr. Beregovskaya was deliberately indifferent to Plaintiff's serious medical needs when she interviewed Plaintiff regarding his 602 appeal for using a walker inside his cell.

Whether or not Dr. Beregovskaya lied on the May 25, 2011 Request for Services (RFS) she submitted for Plaintiff to see a pain and rehabilitation specialist when she wrote "P.E."

Whether or not the "falsification" on the RFS by Dr. Beregovskaya made Plaintiff's

14

condition appear to be less serious than it was.

Whether or not the allegedly falsified RFS was in fact later used to Plaintiff's detriment when doctors were considering his treatment.

Whether or not Dr. Nareddy was deliberately indifferent to Plaintiff's serious medical needs during the October 25, 2011 medical examination.

Whether or not Dr. Nareddy refused to treat Plaintiff on March 1, 2012.

Whether or not Dr. Nareddy falsified plaintiff's July 26, 2011 medical record. Whether the allegedly falsified medical record was in fact later used to Plaintiff's detriment when doctors were considering his treatment.

Whether or not Dr. Nareddy was deliberately indifferent to Plaintiff's serious medical needs during the April 13, 2012 medical visit.

## C. **Disputed Evidentiary Issues**[1]

**Plaintiff asserts that the following evidentiary issues are disputed:**

Based upon Defendants' boilerplate objections to all of Plaintiff's evidence in their reply to Plaintiff's opposition to summary judgment, Plaintiff believes the following may be in dispute:

1. A newspaper article regarding the Federal Receiver at the time, Robert Sillen, who said in part that CDCR's medical was deplorable, which Defendants denied in discovery, thus making it necessary impeachment evidence. It is relevant pursuant to Fed. R. Evid. 607. It is self-authenticated pursuant to Fed. R. Evid. 902(6). Also, it is an exception to the hearsay rule pursuant to Fed. R. Evid. 803(6) and (8).

2. CDCR's own policies dated 2002, 2003, and 2011. As far as Plaintiff is aware all these policies were in place in 2011-2012. These policies not only impeach Defendants during discovery, but also outline the appropriate behavior in each setting which Defendants violated over and over. It is relevant pursuant to Fed. R. Evid. 401 and 402. It is authenticated pursuant to Fed. R. Evid. 902(4) and (5). Plaintiff also swears under penalty of perjury that all his evidence is true and

---

[1] The parties may file motions *in limine*, addressed below, and/or object to the introduction of evidence at trial.

correct as a copy of the originals.

3.  The Merck Manual of Medical Information Second Home Edition, 2003, is self-authenticated by Fed. R. Evid. 902(5), and assuming arguendo that it is not Plaintiff swears under penalty of perjury that the evidence is a true and correct copy of the original text, and if this court wishes he could bring in the whole book. The Merck Manual is a learned treatise under Fed. R. Evid. 803(18). This evidence will be used to impeach Defendants' testimony at trial as it has a comprehensive section on nerve disorders, etc….

4.  Defendants' own IQ criteria, which is part of their own policy, is crucial impeachment evidence and should be admitted pursuant to Fed. R. Evid. 401, 402, 802, 804, and 803(4), (8), and (18).

5.  Letters written by Plaintiff to defendant Nareddy and other doctors at Corcoran and Sacramento, including statements made to him by others. This is not hearsay pursuant to Fed. R. Evid. 801(d-1) and (d-2), also 803(3) and (4).

6.  On-line medical information regarding spinal stenosis, which is Plaintiff's medical condition. This is a hearsay exception pursuant to Fed. R. Evid. 803(4) and (18). This evidence is needed to establish that Plaintiff's symptoms were consistent with spinal stenosis with impingement.

7.  Medical records of Mr. Villegas & Mickey are needed to establish that defendant Nareddy treated Mr. Villegas differently than Plaintiff, while they both had spinal stenosis. Also to establish that defendant Beregovskaya did not follow the IQ criteria like she swore to in discovery, etc…. Plaintiff swears under penalty of perjury that these documents are a true and correct copy of the original. Fed. R. Evid. 902(4). Also relevant to prove habit, as to defendant Nareddy ordering an MRI and not a CT for Mr. Villegas who had spinal stenosis, and defendant Beregovskaya to prove habit as to granting RFSs based upon whim and not the IQ criteria as claimed. Habit as to Dr. Williams and his penchant for falsifying his medical reports. Fed. R. EVid. 406. These are not hearsay pursuant to 803(3) and

(4).

8. Plaintiff's sick-call slips. These are not hearsay pursuant to Fed. R. Evid. 803(4), (6), and (8). This evidence is relevant to prove not only that Plaintiff was complaining the whole time but that Defendant was aware of at least some of the complaints.

9. CDCR's own Pain Management Guidelines (2009) is self-authenticated pursuant to Fed. R. Evid. 902(5). Also Plaintiff swears under penalty of perjury that the copies are true and correct copies of the original. It is not hearsay pursuant to Fed. R. Evid. 803(4), (6), (8), and (18).

10. All these evidentiary issues can be solved via motions *in limine*.

**Defendants assert that the following evidentiary issues are disputed:**

Admissibility of testimony by Plaintiff, including but not limited to, type of treatment, rationale for treatment, and appropriateness of treatment.

**D.      Special Factual Information**

**Plaintiff's Special Factual Information:**

1. On July 26, 2011, at Corcoran State Prison, B-yard, at the medical clinic, defendant Nareddy was extremely negligent in reviewing Plaintiff's medical file and as he already admitted that he failed to fully read defendant Beregovskaya's March 25, 2011 report, he admitted to that negligence. Moreover, Defendant violated his own policies over and over again. He negligently reviewed Plaintiff's 2005 MRI which showed impingement, then lied about it in discovery, as he has freely substituted impingement with pinched nerve and compression, etc…. These acts and omissions were used to Plaintiff's detriment. The regulations violated include, but are not limited to, CDCR's Health Care Services Policies & Procedures Vol. 6, Chapt. 26 11 definitions G "Falsification of the health record is any entry that is untrue or misleading in order to deceive; willful misrepresentation of events by addition of false information or the removal of original documents." 111 Procedures "record all entries completely, concisely, and timely. entries [sic] shall

address specific documentation requirements and be accurate, timely, specific, definitive, concise, legible, and clear." Also Vol. 7 Chapt. 1-B Chronic Care Program 11 Procedure b-2, a, b, c, and d. 11 b 3 and 4 a-c. Furthermore, almost every aspect of CDCR's Pain Management Guidelines 2009. Pages 12-13 G. Pharmacologic Treatment Principles 1 General Principles 3 and 10. Page 32 (3) clinical exam 1 and 2. (6) goals and expectations. 1.B pain scales 1. Page 33 D Treatment 1 general principles 1-4. Page 38-39 V11 A-1 History/physical 1-09. Page 40-41 3-A-B and 4-A, B diagnosis 1 established diagnosis 1-4. Pages 42-43 (3) and (4) 1-3. C-1 Multidisciplinary care 3 and 2 primary care team B. Page 44 role of local institutional existing committee structure 3 & 5. Page 47 C psychological interventions 4 "Let the patient know you believe that the pain is real…" Page 61 PCP Model. *Res ipsa loquitur* should apply where if Plaintiff proves that Defendant did violate his own policies, he was negligent in reviewing Plaintiff's medical record and also by inserting false information that was used to Plaintiff's detriment.

2. On October 25, 2011, defendant Nareddy negligently falsified Plaintiff's medical record to his detriment. He did it in the same place as above, and he violated the same policies as above.

3. On February 22, 2012, defendant Nareddy negligently interfered with Dr. Nguyen's discretion to prescribe medication when he told that doctor not to increase Plaintiff's Methadone to stop Plaintiff from severe pain and withdrawal symptoms.

4. On March 1, 2012, defendant Nareddy told officer Stanley that Plaintiff was to receive no help when he went down to see PA Sisodia. This happened at the same place, and violating the same policies as above.

5. On April 13, 2012, defendant Nareddy negligently falsified Plaintiff's medical record once again by claiming Plaintiff's 2005 MRI showed "mild" forminal stenosis. He also negligently used a CT scan result that was contrary to Plaintiff's seven-year diagnosis of spinal stenosis and which was far below the reliability of

an MRI.  This was used to Plaintiff's detriment.  This violated the same policies as above, and happened at the same place.  This also violated CDCR policies which directly state that an MRI is superior to a plain CT scan.  See IQ Criteria Note #4 and the Pain Management Guidelines 2009, attachment 1 page 87.  *Res ipsa* applies to all the above claims because he either intentionally did it or was negligent in not knowing his own policies.

6.  On March 25, 2011, defendant Beregovskaya was negligent at the same facility and the same clinic as above, by falsifying Plaintiff's medical record that was later used to his detriment.  She also failed to issue an 1845 for Plaintiff's walker, etc…. She negligently failed to do a physical examination yet wrote that she did a PE.  She negligently approved of the confiscation of the walker to outside the cell, violating her own policies.  See Corcoran's OP # 1023, page 12 of 14, and 13 of 14 T 1-7. Also see Health Care Services Policies Vol. 1 Capt. 2 Mission and Values Statement.

7.  On March 27, 2012, defendant Beregovskaya denied both of Plaintiff's RFSs for MRI and specialty services negligently.  This happened at Corcoran State Prison, at an unknown location.  She violated her own IQ criteria by disallowing Plaintiff's RFS, yet allowing RFSs of other prisoners who were similarly situated.  See IQ Criteria and the other prisoner's RFS and reports in Plaintiff's Opposition.

8.  Defendants were negligent in the above manner, which caused Plaintiff severe pain and emotional distress.  *Res Ipsa* applies to all the claims because common sense dictates that these defendants either did their acts and omissions intentionally or negligently.

9.  Plaintiff was 42-43 years old at the time of the negligence.  Plaintiff had an existing injury, but the condition worsened due to Defendant's acts and omissions.

**Defendants' Special Factual Information:**

Plaintiff alleges a single cause of action pursuant to 42 U.S.C. § 1983, for deliberate indifference to medical needs against Dr. Nareddy and Dr. Beregovskaya regarding his medical

needs while he was incarcerated at Corcoran State Prison.  Plaintiff claims he has chronic lower back pain and that Dr. Nareddy was deliberately indifferent in decreasing Plaintiff's Methadone and in ordering Plaintiff a second MRI. Plaintiff alleges that Dr. Beregovskaya was deliberately indifferent when she interviewed Plaintiff at the First Level of his 602 appeal to use a walker inside his cell, which was denied, and that she denied a Request for Services submitted by another provider for a second MRI.  Plaintiff further alleges that both defendants falsified his medical records.

Dr. Beregovskaya saw Plaintiff on two occasions: April 25, 2011 and May 24, 2011. Dr. Nareddy saw Plaintiff on three occasions: July 26, 2011, October 25, 2011 and April 23, 2012.

## IV.    Relief Sought

### Plaintiff's Position on Relief Sought:

Plaintiff is requesting $250,000 in compensatory damages for the pain and suffering, also the emotional pain caused directly from Defendant's acts and omissions.  He is also requesting $300,000 in punitive damages for the egregious actions committed and then lying about it during discovery.

Plaintiff is requesting a permanent injunction forcing CDCR to follow its own rules and regulations, and to treat Plaintiff within those same policies etc…. Also any other relief this court deems necessary.

### Defendants' Position on Relief Sought:

Plaintiff seeks monetary damages.

## V.     Points of Law

### Plaintiff's Points of Law:

McGuckin v. Smith, 974 F.2d, 1050, 1059-60 (9th Cir. 1995). [Illegible] v. Dudley, 2010 US Dist. Lexis 138549, E.D. Cal., Dec. 28, 2010 at *19; Strain v. Sandham, US Dist. Lexis 4760, E.D. Cal., Jan. 22, 2009, at *5-20; Chess v. Dovey, US Dist Lexis 15835 E.D. Cal., Feb. 14, 2011, at *12-64.

Either Defendants did what they did intentionally which is Plaintiff's main claims or they did it negligently by failing to follow their own policies.

**Defendants' Points of Law:**

**A. Eighth Amendment Standard**

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S. Ct. 285, 50 L. Ed. 2d. 251 (1976). An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin,* 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104).

In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. *Hutchinson v. United States*, 838 F.2d 390, 393-94 (9th Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories,* 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct 1970, 128 L. Ed. 2d 811 (1994). Delays in providing medical care may manifest deliberate indifference. *Estelle*, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994); *McGuckin*, 974 F.2d at 1059. However, differences of opinion between a prisoner and prison medical staff as to proper medical care do not give rise to a § 1983 claim. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (quoting *Estelle*, 429 U.S. at 104).

*///*

**B. No Evidence of Deliberate Indifference to Medical Needs**

There is no evidence of deliberate indifference to medical needs. Plaintiff does not allege nor is there evidence to support a finding that the doctors refused or failed to provide medical care. Instead, the undisputed evidence establishes that the doctors were conscientious and concerned about Plaintiff's complaints and provided appropriate medical care. Plaintiff's disagreement with the care provided by Dr. Nareddy and Dr. Beregovskaya is insufficient, as a matter of law to establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d at 332; *Sanchez v. Vild*, 891 F.2d at 242; see also *Estelle v. Gamble*, 429 U.S. at 107.

Plaintiff cannot offer testify about the appropriate standard of medical care or treatment. Fed. R. Evid. 701, 702. In his pretrial report, Plaintiff provides no medical witnesses who can support his claims.

**C. Qualified Immunity**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct 808, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct 2727, 73 L. Ed. 2d 396 (1982)). In analyzing whether a defendant is entitled to qualified immunity, a court must apply a two-prong test: (1) whether the facts make out a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct 2151, 150 L. Ed. 2d 272 (2001); *Pearson*, 555 U.S. at 232. In determining whether the right at issue was "clearly established," the court should conduct the following two-part inquiry: "(1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official have believed his conduct was lawful?" *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993). The defendant is entitled to qualified immunity from suit if either prong is not established in plaintiff's favor. *Saucier*, 533 U.S. at 200-202. Here, under either prong, Defendants are entitled to qualified immunity. Defendants were not deliberately indifferent to Plaintiff's serious medical need and, therefore, did not violate Plaintiff's Eighth Amendment.

**VI.** **Abandoned Issues**

None.

**VII.** **Witnesses**

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses. **NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R. Civ. P. 16(e); Local Rule 281(b)(10).**

    **A.** **Plaintiff's Witness List**[2]

    1. Steven Vlasich

    2. Michael Dorrough

    3. Perry Robert Avila

    4. James Mickey

    **B.** **Defendants' Witness List**[3]

    1. Dr. O. Beregovskaya

    2. Dr. C. Nareddy

    3. Dr. Edgar Clark

    4. Dr. Lori Karan

    5. Dr. Gabe Williams

**Exhibits**

The following is a list of documents or other exhibits that the parties expect to offer at trial. **NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R.**

---

[2] Plaintiff also listed Jerry Villegas as a witness in his pretrial statement, but the Court found that Plaintiff failed to show that the testimony offered by Mr. Villegas would be sufficiently relevant to justify the cost of bringing him to court (ECF No. 89, p. 4).

[3] Defendants are not required to call all of the witnesses listed. However, as is the Court's general practice in cases such as this, defendant Beregovskaya shall be present on **December 18, 2018, by 9:30 a.m.,** and shall be available for Plaintiff to call for direct examination.

**Civ. P. 16(e); Local Rule 281(b)(11).**

     **A.**     <u>**Plaintiff's Exhibits**</u>[4]

RFS dated 5-3-05 by DR Thirakomen, for an MRI.

Two reports by Plaintiff's first specialist DR Friedman dated 5-24-05.

MRI dated 5-6-05, the "2005" MRI.

Medical report dated 8-8-05 by Dr. Neubarth that showed Plaintiff had a weak left big toe dorsifexor.

8-3-06 Chono for a cane by Dr. Zoher.

2006 RFS for Corcoran's Pain Committee that kept Plaintiff on Methadone.

6-21-07 Non-Formulary by Dr. Hasadsri.

9-19-08 Pain management by Dr. Kazi.

10-6-08 report by Dr. Kim which showed that Plaintiff's Pain Management doctor Palencia told Corcoran doctors to leave Plaintiff on the same dose of Methadone "indefinately" [sic] as prescribed by him.

3-30-09 RFS by Dr. Neubarth.

RFS by Dr. Neubarth dated 7-29-09.

8-7-09 RN report by RN Barbolla.

9-29-09 RN report by Holt.

12-22-09 RN Report by Barbolla.

6-7-10 NP Brar report.

6-25-10 NP Bondoc report where she took Plaintiff's cane.

7-21-10 NP Brar orders a walker.

8-4-10 CDC-128-C Chrono for walker.

11-23-10 report by NP Dhah showing Plaintiff's DTRs at 1+.

4-25-11 report by defendant Beregovskaya.

_____

[4] Plaintiff's exhibit list ends on page fourteen of his pretrial statement. (ECF No. 78, p. 14). However, it appears that Plaintiff may not have meant for his exhibit list to end on this page. Accordingly, if Plaintiff attempts to introduce at trial any of the evidence listed on pages fourteen through twenty-one of his pretrial statement, the Court will not exclude that evidence on the ground that it was not listed in this order.

5 25-11 report by the same as above.

6-1-11 report by Dr. Clark.

7-8-11 MAR showing a decrease in Methadone by the same as above.

7-26-11 report by defendant Nareddy.

10-25-11 report by the same as above.

12-13-11 report by Dr. Karan proving that Plaintiff was to be tapered off Methadone more than a month before the committee met.

1-18-12 PT report for the committee.

1-19-12 Pain Committee report.

1-28-12 MAR showing defendant Nareddy tapering Plaintiff.

2-17-12 report by RN Ratliff.

2-22-12 TTA report.

2-22-12 Dr. Nguyen MAR proving defendant Nareddy interfered with Dr. Nguyen's intention to increase Plaintiff's methadone.

2-29-12 TTA report by Dr. Nguyen.

3-1-12 NP Sisodia report.

3-16-12 TTA Dr. Aye's report.

3-21-12 NP Sisodia report.

3-22-12 RFS for MRI & Ortho by NP Sisodia, which shows the denial by defendant Beregovskaya.

3-26-12 RN report by Ratliff.

3-27-12 TTA Dr. Aye wrote "needs PCP to follow-up."

4-2-12 report by Dr. Clark where he states that he was going to get at headquarters to fix Plaintiff's medical problems.

4-10-12 report by Dr. Gill where he wrote MRI then crossed it out to write CT with contrast.

4-10-12 CT report.

4-13-12 defendant Nareddy's report where he rubbed Plaintiff's nose in the CT results,

25

etc….

4-13-12 RFS to Dr. Williams by defendant Nareddy.

5-9-12 Telemed report by Dr. Williams.

5-16-12 defendant Nareddy report where he read William's report.

5-23-12 Psychologist Ahlmeyer's report where he basically corroborated Plaintiff's allegations of falsifications.

6-27-12 PA Sisodia's report.

7-10-12 Dr. Clark's report where he gave Plaintiff the runaround about giving him a real physical examination.

7-20-12 Dr. Clark gives Plaintiff a full and fair physical examination.

7-20-12 RFS for MRI by Dr. Clark.

7-30-12 new MRI.

8-1-12 Dr. Sao report wrote Plaintiff's DTRs were decreased.

8-1-12 TTA report.

8-1-12 RFS for MRI with contrast.

8-13-12 MRI with contrast results.

8-23-12 report by Dr. Karan report with falsifications.

8-23-12 RFS for neuro-surgery by Dr. Karan.

9-14-12 report by Dr. Karan that consolidated three visits in one report.

9-26-12 RN Ratliff report.

9-28-12 Telemed by Plaintiff's neurosurgeon Dr. Wiebe.

10-2-12 RN report by ?

10-8-12 RN Ratliff report.

10-17-12 RN Ratliff report.

10-23-12 Dr. Nguyen report where he reinstated Plaintiff's Methadone without Committee approval, and in the face of their alleged recommendation that no CDCR doctor can go against.

11-27-12 Dr. Wiebe operation report.

12-12-12 Dr. Yu chrono for wilker.

1-7-13 Dr. Clark's report about Dr. Karan's falsifications.

1-7-13 Dr. Nguyen's report.

1-8-13 Non-Formulary request for Neurontins.

1-22-13 Dr. Nguyen's report.

3-25-13 Dr. Nguyen's report.

11-8-13 report by Dr. Ulit.

CCR Title 15 3350 provisions of medical care.

CPHCS "Care guide chronic pain, using crushed nerves."

CPHCS policy chronic pain ability to function etc.

CPHCS policy over-view (3 pages).

CPHCS Chapt. 5 Professional Medical Staff.

CPHCS Chapt. 23 Chronos (3 pages).

CPHCS Chapt. 2 Mission value statement.

CPHCS Chapt. 11 Patient's rights.

CPHCS Chapt. 2 General Rules.

CPHCS Chapt. 26 Documentation principles, health records.

Interqual Criteria "IQ Criteria" 2012 specialty referral.

Interqual Criteria "IQ Criteria" 2012 Imaging Criteria.

Interqual Criteria 2012 Rehabilitation.

Operational Policy 105 2012 Sacramento's criteria for walker (2 pages).

Operational Policy 1023 Corcoran's March 2016 criteria for a walker (3 pages). These documents were given to Plaintiff during discovery by Defendants.

3-28-12 Prison law Office Memorandum pursuant to the settlement agreement.

4-26-12 Prison Law Office Memo. encapsulating Dr. McCabe's response to their Memo.

6-4-12 PLO reopens Plaintiff's case, and attacks the 1-19-12 Corcoran Pain Committee report.

6-19-12 PLO sent the response by Dr. Wang.

7-5-12 PLO explains the answer by Dr. Wang in a two-page letter.

**B.    Defendants' Exhibits**

| Exhibit No. | Description |
|---|---|
| Defendants A | CDCR 2012 InterQual Criteria for Magnetic Resonance Imaging (MRI) of Lumbar Spine. |
| Defendants B | Disability Placement Program Verification (DPPV), CDC 1845 Form. |
| Defendants C | Steven Vlasich's 602 Health Care Appeal No. COR HC 11019759. |
| Defendants D | Plaintiff's medical records dated May 6, 2005. |
| Defendants E | Plaintiff's medical records dated April 25, 2011. |
| Defendants F | Plaintiff's medical records dated May 24, 2011. |
| Defendants G | Plaintiff's medical records dated May 25, 2011. |
| Defendants H | Plaintiff's medical records dated June 1, 2011. |
| Defendants I | Plaintiff's medical records dated July 26, 2011. |
| Defendants J | Plaintiff's medical records dated October 25, 2011. |
| Defendants K | Multidisciplinary Pain Committee Minutes for January 19, 2012. |
| Defendants L | Plaintiff's medical records dated February 17, 2012. |
| Defendants M | Plaintiff's medical records dated March 28, 2012. |
| Defendants N | Plaintiff's medical records dated April 13, 2012. |
| Defendants O | Plaintiff's medical records dated May 9, 2012. |
| Defendants P | Plaintiff's medical records dated July 20, 2012. |
| Defendants Q | Plaintiff's medical records dated August 23, 2012. |
| Defendants R | Plaintiff's medical records dated September 14, 2012. |
| Defendants S | Declaration of Edgar Clark, M.D. |

**VIII.    Discovery Documents to be Used at Trial**

**Plaintiff's Discovery Documents to be Used at Trial[5]**

Defendant Beregovskaya's RFA set l pages 1-6

Defendant Beregovskaya's RFA set 2 pages 1-8

Defendant Beregovskaya's Special Interrogatories pages 1-10

---

[5] In this section Plaintiff was supposed to provide "[a] list of all portions of depositions, answers to interrogatories, and responses to requests for admission that the party expects to offer at trial," Local Rule 281(b)(12), which he at least partially did.  However, Plaintiff also lists documents that are not responsive.  (See ECF No. 78, pgs. 14-21).  Only responsive documents are listed in this order.

Defendant Nareddy's RFA set l pages l-7

Defendant Nareddy's RFA set 2 pages 1-9

Defendant Nareddy's Special Interrogatories pages l-9

**Defendants' Discovery Documents to be Used at Trial**

Deposition of Plaintiff.

Defendants' Interrogatories, Request for Admissions and Request for Production of Documents to Plaintiff and Plaintiff's responses.

## IX.    Further Discovery or Motions

Plaintiff intends to file a motion *in limine* proscribing the use of any of Plaintiff's prior convictions or any prison misconduct, or anything that cannot be deemed relevant and not unduly prejudicial.    It also appears that Plaintiff may file a motion *in limine* to exclude some of Defendants' expert testimony as cumulative, unnecessary, and possibly prejudicial.    The procedures related to motions *in limine* are described below.

Defendants state that no further discovery motions are anticipated.

## X.    Stipulations

None.

## XI.    Amendments/Dismissals

None.

## XII.    Settlement Negotiations

The parties attended a settlement conference with Judge Carolyn Delaney on February 5, 2018. The case did not settle.  There have been no further settlement negotiations.

## XIII.    Agreed Statement

The parties have not agreed on a statement.  Defendants suggest the following statement: Plaintiff alleges Dr. Nareddy and Dr. Beregovskaya violated his civil rights under the Eighth Amendment.  Dr. Nareddy and Dr. Beregovskaya deny these allegations.

## XIV.    Separate Trial of Issues

Plaintiff states that a separate trial might be needed on the issue of a permanent injunction.

Defendants state "N/A."

As discussed on the record at the telephonic trial confirmation hearing, there will be no separate trial on the issue of a permanent injunction (although, if necessary, there will be a separate ruling).

## XV. **Impartial Experts – Limitation of Experts**

Plaintiff states that a court appointed expert would be ideal in this case, since Defendants are doctors and have perjured themselves over and over again. Plaintiff argues that an impartial expert would be able to settle these issues a lot easier than Plaintiff bringing each piece of evidence showing all the inconsistencies in Defendants' defense.

Defendants state "[n]one."

Plaintiff has not filed a motion for the Court to appoint an independent expert witness, and the Court does not see a need for one. Accordingly, the Court will not appoint an independent expert witness.

## XVI. **Attorney's Fees**

Plaintiff, proceeding *pro se*, is not entitled to attorney's fees. *Kay v. Ehrler*, 499 U.S. 432, 435, 11 S. Ct. 1435 (1991).

Defendants state "N/A."

## XVII. **Trial Exhibits**

Special handling of trial exhibits is not anticipated.

## XVIII. **Trial Protective Order**

A trial protective order is not anticipated.

## XIX. **Miscellaneous**

### A. **Further Trial Preparation**

#### 1. **Motions in Limine**

##### a. **Briefing Schedule**

Any party may file a motion *in limine*, which is a procedural mechanism to limit in advance testimony or evidence in a particular area. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quotation marks omitted). In the case of a jury trial, the Court's ruling gives

Plaintiff and Defendants' counsel advance notice of the scope of certain evidence so that admissibility is settled before attempted use of the evidence before the jury. *Id.* at 1111-12 (quotation marks omitted).

Any motion *in limine* must be served on the other party and filed with the Court by **November 7, 2018**. Any motion *in limine* must clearly identify the nature of the evidence that the moving party seeks to prohibit the other side from offering at trial.

Any response to a motion *in limine* must be served on the other party and filed with the Court by **November 21, 2018**.

A written order will likely issue resolving these motions prior to trial. Otherwise, a motion *in limine* hearing will be held at 8:00 a.m. on the morning of the first day of trial.

**Whether or not a party files a motion *in limine*, that party may still object to the introduction of evidence during the trial.**

### 2. <u>Other</u>

#### a. <u>Trial Briefs</u>

The parties are relieved of their obligation under Local Rule 285 to file a trial brief. If the parties wish to submit a trial brief, they must do so on or before **December 4, 2018**.

#### b. <u>Verdict Form</u>

The Court will prepare the verdict form, which the parties will have the opportunity to review on the morning of trial. If the parties wish to submit a proposed verdict form, they must do so on or before **December 4, 2018**.

#### c. <u>Jury Instructions</u>

The Court will prepare the jury instructions, which the parties will have the opportunity to review on the morning of trial. Defendants shall file proposed jury instructions as provided in Local Rule 163 on or before **December 4, 2018.** Plaintiff is not required to file proposed jury instructions but if he wishes to do so, he must file them on or before **December 4, 2018**.

The parties shall use Ninth Circuit Model Civil Jury Instructions to the extent possible. Ninth Circuit Model Jury Instructions SHALL be used where the subject of the instruction is covered by a model instruction. Otherwise, BAJI or CACI instructions SHALL be used where the

subject of the instruction is covered by BAJI or CACI.  All instructions shall be short, concise, understandable, and neutral and accurate statements of the law.  Argumentative or formula instructions will not be given and must not be submitted.  Quotations from legal authorities without reference to the issues at hand are unacceptable.

The parties shall, by italics or underlining, designate any modification of instructions from statutory or case authority, or any pattern or form instruction, such as the Ninth Circuit Model Jury Instructions, BAJI, CACI, or any other source of pattern instructions.  The parties must specifically state the modification made to the original form instruction and the legal authority supporting the modification.

The Court will not accept a mere list of numbers of form instructions from the Ninth Circuit Model Jury Instructions, CACI, BAJI, or other instruction forms.  The proposed jury instructions must be in the form and sequence which the parties desire to be given to the jury.  All blanks to form instructions must be completed.  Irrelevant or unnecessary portions of form instructions must be omitted.

All jury instructions shall indicate the party submitting the instruction (e.g., Plaintiff or Defendants), the number of the proposed instruction in sequence, a brief title for the instruction describing the subject matter, the text of the instruction, and the legal authority supporting the instruction.  **Defendants shall file and serve their jury instructions.  Defendants must also provide the Court with a copy of their proposed jury instructions, in Word format, via e-mail at:  ljoorders@caed.uscourts.gov**.

### d.     Proposed Voir Dire

Proposed voir dire questions, if any, shall be filed on or before **December 4, 2018**, pursuant to Local Rule 162.1.

### e.     Statement of the Case

The parties may serve and file a non-argumentative, brief statement of the case which is suitable for reading to the jury at the outset of jury selection on or before **December 4, 2018**.  The Court will consider the parties' statements but will draft its own statement.  The parties will be provided with the opportunity to review the Court's prepared statement on the morning of trial.

### f.     Trial Exhibits

The original and two copies of all trial exhibits, along with exhibit lists, shall be submitted to Courtroom Deputy Irma Munoz no later than **December 4, 2018**. Plaintiff's exhibits shall be pre-marked with the prefix "PX" and numbered sequentially beginning with 100 (e.g., PX-100, PX-101, etc.). Defendants' exhibits shall be pre-marked with the prefix "DX" and numbered sequentially beginning with 200 (e.g., DX-200, DX-201, etc.). Exhibits with multiple pages shall be numbered on each page (e.g., PX-100, page 1 of 10, etc.).

**The parties are required to meet and confer, by telephone or other means, to agree upon and identify their joint exhibits, if any.** Joint exhibits shall be pre-marked with the prefix "JT" and numbered sequentially beginning with 1 (e.g., JT-1, JT-2, etc.), and Defendants' counsel shall submit the original and two copies of the joint trial exhibits, with exhibit lists, no later than **December 4, 2018**.

### XX.     Objections to Pretrial Order

Written objections to the pretrial order, if any, must be filed on or before **November 5, 2018**. Such objections shall specify the requested modifications, corrections, additions or deletions.

### XXI.     Compliance with Pretrial Order

Strict compliance with this order and its requirements is mandatory. The Court will strictly enforce the requirements of this pretrial order, and counsel and parties are subject to sanctions for failure to fully comply with this order and its requirements. The Court will modify the pretrial order "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). The Court ADMONISHES the parties and counsel to obey the Federal Rules of Civil Procedure and the Court's Local Rules and orders. The failure to do so will subject the parties and/or counsel to sanctions as the Court deems appropriate.

IT IS SO ORDERED.

Dated:    __October 17, 2018__        _____ **/s/ Lawrence J. O'Neill** _____
                                       UNITED STATES CHIEF DISTRICT JUDGE